Barbara Jean BERRY et al., Plaintiffs,

v.

SCHOOL DISTRICT OF the CITY OF
BENTON HARBOR et al.,
Defendants.

No. C.A. 9.

United States District Court,
W. D. Michigan, S. D.

Opinion July 25, 1978.

Order July 25, 1978.

Amended Order Aug. 7, 1978.

Louis R. Lucas, Elijah Noel, Jr., Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas Atkins, Roxbury, Mass., John A. Dziamba, Willimantic, Conn., Stuart J. Dunnings, Jr., Dunnings & Gibson, Lansing, Mich., Nathaniel R. Jones, Gen. Counsel, NAACP Special Contribution Fund, New York City, for plaintiffs.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Roccy M. DeFrancesco, Adams & DeFrancesco, St. Joseph, Mich., for Benton Harbor School Bd.

John L. Crow, Francis A. Jones, Hartwig, Crow, Jones & Postelli, St. Joseph, Mich., for Eau Claire School Dist.

George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for State of Michigan.

Craig Atchinson, Asst. Atty. Gen., Lansing, Mich., for State of Michigan Boundary Commission.

E. Michael Stafford, Farhat, Burns & Story, Lansing, Mich., for Coloma School Dist.

Lee Boothby, Boothby & Huff, Berrien Springs, Mich., for Sodus Tp./Fellner Group.

Andrew J. Burch, Coloma, Mich., for intervening defendants Baldwin and Concerned Parents of Hagar Tp. School Dist. No. 4.

Thomas J. Nordberg, Lansing, Mich., for Berrien County Intermediate School Dist.

## OPINION

FOX, Chief Judge.

This opinion marks the conclusion of Phase II of these lengthy school desegregation proceedings. In an opinion issued August 23, 1977, at the end of Phase I of this action on remand from the Court of Appeals for the Sixth Circuit, this court ruled that the Benton Harbor Area School District had failed to rebut the prima facie case of de jure segregation established against it during an earlier trial.

The present opinion is concerned with the liability of those parties who have been referred to as the "added defendants" during the course of these proceedings: William G. Milliken, Governor of the State of Michigan; Frank J. Kelley, Attorney General of the State of Michigan; John W. Porter, Superintendent of Public Instruction of the State of Michigan; the State Board of Education; the Berrien County Intermediate School District and its Superintendent; the Eau Claire School District and its Superintendent, Donald McAlvey; and the Coloma Community School District and its Superintendent, William Barrett. The Phase I opinion may be looked to for an examination of the procedural history of this litigation, a discussion of the segregation problem, and the applicable legal principles. *Berry v. School District of City of*

*Benton Harbor,* 442 F.Supp. 1280, 1283–95 (W.D.Mich.1977). The following opinion constitutes the court's combined Findings of Fact and Conclusions of Law on the issues raised in Phase II. The liability of the various parties will be separately considered.

### I. The State Defendants.[1]

The claims against the State defendants are based essentially upon two grounds. First, the intentional actions or inactions of the State defendants perpetrated de jure segregated conditions of the Benton Harbor Area School District (BHASD) because of the total racial impact upon the entire district. Second, that the State Board of Education (SBE) acted improperly in the approval of two petitions for the transfer of property out of the BHASD, thereby further increasing de jure segregation in the district. These two grounds will be examined in order.

### A. Action and Inaction of State Defendants.

As noted above, a previous opinion of this court found the BHASD Board of Education guilty of the de jure segregation of the Benton Harbor public schools. The opinion detailed constitutional violations in almost every area of school administration and found that their segregative effects pervaded the entire school district. Among the violations established were the assignment of teachers upon the basis of race, discriminatory "tracking" programs at one junior high, disparate conditions of facilities and educational supplies, intact busing, segregative feeder patterns, discriminatory placement of portable classrooms and temporary facilities, and the inconsistent application of a neighborhood schools policy.

The plaintiffs must show, in order to prevail against the state defendants, that those defendants, to a substantial degree,

contributed to the creation or the maintenance of the segregated schools in Benton Harbor. "[W]here state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief." *Sterling v. Constantin,* 287 U.S. 378, 393, 53 S.Ct. 190, 193, 77 L.Ed. 375 (1932). The Governor and the Attorney General are proper parties in litigation of this nature. *Bradley v. Milliken,* 433 F.2d 897, 905 (6th Cir. 1970). As this court has previously stated:

> "The State of Michigan cannot parcel out its jurisdiction and deliberately achieve by bits and pieces what it could not do directly by statute. When such a situation is alleged to exist, the court must look closely at the actions of each agency to determine whether it has met its constitutional responsibilities. To allow each agency to plead constitutional violations of other agencies in exculpation of its own, would be to mock the Constitution of the United States and the Constitution of the State of Michigan." *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143, 185 (W.D.Mich.1973), *affirmed,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

In addition to the guarantees of the United States Constitution, the Michigan Constitution provides that: "Every school district *shall* provide for the education of its pupils *without discrimination* as to religion, creed, race, color or national origin." (Emphasis added.) Michigan Const. art. VIII, § 2. The official Constitutional Convention Comment states that: *"The anti-discrimination clause is placed in this section as a declaration which leaves no doubt as to where Michigan stands on this question."* (Emphasis added.)

This clear, precise constitutional declaration of educational policy mandates all

1. Unless otherwise indicated, the term "State defendants" will not include the State Boundary Commission. The issues regarding the

Boundary Commission will be discussed separately from those of the other State defendants.

state and school authorities to eliminate discrimination wherever it exists in the school system. It mandates the Governor as the chief executive officer, and the Attorney General. The language "without discrimination" is simple, affirmative language, and is not limited to intent. Discrimination in the school system must be eradicated, root and branch.

The executive power of the State of Michigan is vested in the Governor. Mich. Const. art. V, § 2. The Governor "shall take care that the laws be faithfully executed" and may initiate proceedings in the name of the state to restrain constitutional violations, Mich.Const. art. V, § 8. In addition to being the chief executive of the State, he is an ex officio member of the State Board of Education with a voice but without a vote. The voice of the chief executive of the State can contribute to the enforcement of the State's duty to support the United States' and the State of Michigan's constitutional obligations, which he has sworn to do. His action or inaction in words and deeds effects support or denial of constitutionally guaranteed rights. At final argument, the plaintiffs requested the Governor be dismissed as a defendant. That motion is denied.

■ The Attorney General, as chief law enforcement officer of the State, swears to support the Constitutions of the United States and of the State of Michigan. Mich. Const. art. XI, § 1; M.C.L.A. § 168.80. The Attorney General, however, has not taken any action to fulfill his constitutional duties in the face of the pervasive segregation of the Benton Harbor Public Schools.[2]

The Sixth Circuit has recently reaffirmed its holding that

"[S]tate officials [can] be held jointly responsible with local authorities for segregated conditions in local schools, where the state officials [have] shown 'consistent inaction in preventing increased segregation' and [have] consistently provided funding and other assistance to the local district. *Oliver v. Michigan State Bd. of Ed.*, 508 F.2d 178, 186–87 (6th Cir. 1974), cert. den., 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975)." *United States v. School District of City of Ferndale*, 577 F.2d 1339, at 1348 (6th Cir. May 17, 1978).

Although the *Ferndale* case was brought under the Equal Educational Opportunities Act of 1974 and Title IV of the Civil Rights Act of 1964, the Court held that the principle of joint liability was just as applicable there as it is in cases under the Fourteenth Amendment. Despite the filing of this case more than ten years ago, despite a finding in 1970 that the BHASD illegally segregated its teaching staff and engaged in discriminatory "tracking" programs at the Benton Harbor Junior High School, and despite a finding by Judge Kent that the BHASD neighborhood school policy, as constituted, denied equal educational opportunity, the Attorney General of this State has consistently failed to take action to prevent continued and increased segregation in the Benton Harbor public schools. He has, to a substantial degree, by his actions and inactions, contributed to the creation and maintenance of segregated conditions in the Benton Harbor Area School District.[3]

2. The Governor and the Attorney General, of course, had the opportunity to offer exculpatory evidence that they had in fact exercised their affirmative obligations under the United States and Michigan Constitutions with regard to the BHASD. They, however, filed a motion to strike their names from plaintiffs' witness list, a motion this court granted in its discretion. Phase II transcript (II Tr.) 1226 28. Nor did their attorney offer any exculpatory evidence on their behalf.

3. The Attorney General has often discouraged, in his opinions issued pursuant to M.C.L.A. § 14.32, attempts by the SBE to increase the

integration of Michigan public schools. Following the decision of the Supreme Court in *Brown v. Board of Education*, the Superintendent of Public Instruction reviewed various complaints requesting his assistance in preventing the establishment of racially identifiable schools. The Superintendent refused to act upon these complaints on the ground that he had been advised by the Attorney General that he had no authority to act. *Oliver, supra*, 368 F.Supp. at 186. More recently, the Attorney General ruled that the SBE may not impose student and staff racial balance regulations that include sanctions against local school districts for noncompliance, such as termination

Where, in cases such as this, a pattern of violation of constitutional rights is established, the affirmative obligation under the Fourteenth Amendment to remedy those violations is imposed not only on the local school district, but also upon the State officials. *Bradley v. Milliken*, 338 F.Supp. 582, 594 (E.D.Mich.1971), *affirmed*, 484 F.2d 215 (6th Cir. 1973).

■ School districts in the State of Michigan are instrumentalities of the State and subordinate to the SBE and its Superintendent. The SBE exercises "[l]eadership and general supervision over all public education." Mich.Const. Art. VIII, § 3. Hence, the segregative actions and inactions of a local board of education are the actions of an agency of the State of Michigan and may be attributable to the SBE and its Superintendent. *Bradley v. Milliken, supra*, 484 F.2d at 238–42. In Phase I of these proceedings the intentional segregation of the Benton Harbor public schools was established. No evidence has been introduced during Phase I nor during the present phase of this litigation to show why the actions of the BHASD Board should not be attributed to the SBE and the Superintendent of Public Instruction.

The powers and constitutional responsibilities of the State Board of Education have been extensively examined in other cases. *See e. g., Bradley v. Milliken*, 484 F.2d 215, 245–59 (6th Cir. 1973), *rev'd on other grounds*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); and *Oliver v. Kalamazoo Board of Education*, 368 F.Supp. 143,

163, 185–90 (W.D.Mich.1973). That examination of the law need not be repeated here and is incorporated herein by reference. The record painted in those cases, unfortunately, is one of failure on the part of the SBE and its Superintendent to meet their constitutional responsibilities. As I concluded in *Oliver, supra*:

"In sum, the Superintendent had general supervisory authority over public education in Michigan between 1954, the date of the Brown decision, and the adoption of the new [State] Constitution. The State Board of Education and the Superintendent as its chief executive officer have shared this constitutional power between 1963 and the present. During this entire period, the Superintendent and the Board were aware of racial segregation in Michigan public schools through complaints to this effect and then through their own statistical data. Still, the Superintendent and the State Board have persistently failed to act in a meaningful way to ameliorate the situation.

"These facts compel the conclusion that the State of Michigan, through the State defendants in this case, has intentionally sanctioned the segregation of schools by local boards, and has made a substantial contribution to the creation and maintenance of segregated public schools . . ." *Id.*, 368 F.Supp. at 190.

In both the *Bradley* and the *Oliver* case, the SBE and its Superintendent had a full, fair opportunity to contest the findings of the courts that they had intentionally sanc-

---

of state school aid payments. As a result of that opinion, Superintendent Porter testified that the SBE issued advisory guidelines, rather than mandatory regulations, in an effort to encourage fourteen racially impacted school districts in Michigan (including Benton Harbor) to integrate their schools. II Tr. 724–30. *See also*, testimony of SBE Board Member Marilyn Kelly, II Tr. 1092–95. This latter ruling of the Attorney General is questionable in light of the broad constitutional and statutory powers of the SBE. *See* p. 635, *infra*. It is also inconsistent with previous opinions of the Attorney

General deeming the SBE to have the authority to promulgate expulsion rules, Op.Atty.Gen., July 7, 1970, No. 7705; to set the length of the school year, Op.Atty.Gen., Dec. 1, 1970, No. 4714; and to establish a program for accrediting schools, Op.Atty.Gen., May 5, 1971, No. 4707. The opinion in *Bradley v. Milliken*, 484 F.2d 215, 248 (6th Cir. 1973), also notes that previous Attorney General opinions have held that the SBE may withhold local district funds for the hiring of uncertified teachers, for defaulting on state loans, and for other reasons.

tioned the segregation of schools by local boards. In both cases they were found wanting. In *Bronson v. Board of Education*, 525 F.2d 344, 349 (6th Cir. 1975), the Sixth Circuit commented that "we do not believe that school desegregation cases are so different from other types of litigation that principles of res judicata and collateral estoppel should never be applied to them." *Cf., United States v. School District of the City of Ferndale, supra*, at 1348–1350. Had plaintiffs made the appropriate motion, it would seem that the findings in both *Bradley* and *Oliver* as regards the actions of the SBE on a statewide basis could be applied in the instant case, applying accepted principles of the offensive use of collateral estoppel. Such a motion was not made and collateral estoppel will not be here applied. There is, however, a great amount of evidence in the record in the present case to justify the same conclusion here that I made in the above-quoted portion of *Oliver, supra. See also United States v. School District of City of Ferndale, supra*, at 1348.

In 1966, the SBE and the Michigan Civil Rights Commission entered into a "Joint Policy Statement on Equal Educational Opportunity" pledging themselves to the elimination of segregation in Michigan public schools.[4] This statement reads in part:

"The State Board of Education and the Michigan Civil Rights Commission jointly pledge themselves to the full use of their powers in working for the complete elimi-

nation of existing racial segregation and discrimination in Michigan's public schools. *It shall be the declared policy of the State Board of Education that in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff on account of race or color.*" (Emphasis added.)

In September 1967, the Joint Policy Statement was followed up by a letter from the State Superintendent suggesting the local superintendents adopt a five-point plan to facilitate integration.[5] Despite the lofty words of these documents, the SBE took no action which can be said to be reasonably related to the goal of preventing and eliminating the purposeful segregation then existing in the Benton Harbor Schools.

The State Board cannot claim it was without information about the existing conditions in the BHASD. During hearings on petitions to transfer property out of the Benton Harbor district, as will be discussed later,[6] the SBE received literally volumes of testimony and documents about the problems and conditions of the Benton Harbor district. The SBE was also the recipient of numerous communications from the local board, the local branch of the NAACP, and private individuals informing the SBE of the state of affairs there and beseeching the SBE not to undertake certain acts which could increase segregation in Benton Harbor.[7]

---

4. Plaintiffs' Exhibit on Remand (PXR)–251. The "Joint Policy Statement" was reaffirmed by the SBE in 1973. The statement is reproduced in its entirety in *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766, 776–77 (W.D.Mich.1971).

5. PXR–54. There appears to have been no follow-up to pressure the local districts in any way to implement these suggestions. *See, Oliver, supra*, 368 F.Supp. at 189-90. Dr. Robert Green, plaintiffs' expert witness, stated in his rebuttal testimony that the SBE has failed to provide effective leadership to implement the

Joint Policy Statement and desegregate Michigan schools. II Tr. 4552.

6. See Part I(B) *infra* and State Board of Education Exhibit (SBE Ex.) 1–a.

7. *See e. g.*, PXR–53, –81, –105, –255, –289. *See, also*, Testimony of Lester Page, former president of the BHASD Board, II Tr. 939–40; testimony of Herschel McKenzie, former president of the Twin Cities (Benton Harbor-St. Joseph) Branch of the NAACP, II Tr. 1144–47; testimony of Harzel Taylor, former member of BHASD Board, II Tr. 1405- 07.

On two occasions the State Board made or participated in exhaustive studies of the Benton Harbor schools. On the first occasion, the Benton Harbor Board requested the help of the SBE in resolving racial tensions at Benton Harbor High School which resulted in the outbreak of violence there on the morning of January 15, 1971.[8] The request led to an SBE staff study of the district and an eighteen-page report.[9] On the second occasion, as a result of the high school disturbances and the concurrent attempts to transfer large blocs of property out of the BHASD, the SBE had consultants from its staff serve on a "Blue Ribbon Committee" which was formed in an attempt to resolve the problems of the BHASD.[10] The SBE was also the recipient of reports of the so-called "Redistricting Planning Committee," which was formed to implement the suggestions of the Blue Ribbon Committee.[11]

The SBE staff report, made after the high school disruption, identified the Benton Harbor schools as "racially isolated," possessed of a changing racial population, racially concentrated, and lacking in Black teachers and administrators.[12] Significantly, the report described at length the school desegregation litigation then affecting the district. It was noted that Judge Kent had found that the assignment of teachers upon the basis of race and the "track system" in use at Benton Harbor Junior High School unconstitutionally denied Black students equal educational opportunity. The State defendants cannot claim that Judge Kent's finding of no de jure segregation immunized them from any

responsibility to take action to remedy the situation in Benton Harbor, for even the staff report correctly stated that this remained a "substantial issue of law:"[13]

"Lacking the record in the *Deal* and *Goss* cases, the Court indicated that it was bound by these cases, but then went on to make additional findings for the development of a record for presentation of this case to the U. S. Court of Appeals. The Court found that: (1) Black children in Benton Harbor, by being restricted to a black or predominantly black neighborhood school, are denied an equal opportunity for education; and, (2) The neighborhood school concept, as it exists in the Benton Harbor School System, results in the denial of equal opportunity to the black child who is forced to attend a predominantly-black school.

On the basis of these findings of fact, the Court indicated that if this were a case of first impression it would reach a conclusion contrary to that reached by the Court of Appeals in *Deal*. The Court expressed the view that it did not have the authority to reach such a conclusion. However, the Court expressed satisfaction that there was a substantial issue of law on the findings of fact upon which the plaintiffs may base a judgment; and that there was a substantial issue of law upon the findings of fact which this Court has made which would lead it to reach a conclusion contrary to that reached by the Court of Appeals in *Deal*. Therefore, the Court granted the right of appeal before any decree for relief was entered. This appeal is now pending."

---

8. PXR–57. The parties consumed a great deal of court time debating whether the matter was a "riot" or a "disturbance." Whatever name is given the incident, it is clear that it was the result of the failure of the defendants here to resolve the deeper problems of the Benton Harbor district and was extremely disruptive of attempts to make the 1965 consolidation of the BHASD a functioning reality.

9. *Id.*

10. Berrien County Intermediate School District Exhibits (I)–54b, –58, –59, –62, –63.

11. I–90, -91. The proceedings and the recommendations of both the Blue Ribbon and the Redistricting Planning Committees will be discussed to a greater extent in Part III *infra.*

12. PXR–57 at 8. *Id.* at 2–3 and 6.

13. *Id.* at 9–10.

This very report of the SBE staff should have put the SBE and its Superintendent on notice that it could not safely continue its policy of intentional inaction with regard to the Benton Harbor schools in reliance on the opinion of Judge Kent. At the very least, Judge Kent's opinion imposed on the SBE the affirmative obligation to assist the BHASD in desegregating its teacher staff. This the SBE failed to do.

By virtue of its membership on the "Blue Ribbon Committee," and its receipt of the reports of the "Redistricting Planning Committee," the SBE was again exposed to a tremendous amount of information that alerted it to the continuing segregation in Benton Harbor.[14] The Board was aware that many of the proposed "solutions" to Benton Harbor's problems would have a segregative result.[15] It was aware that the concerns expressed to the Committees by the members of the community, such as "stability of the area," "safety of children in the schools," and "protection of property values," were often code words for racial fears.[16] Finally, the SBE was aware that many of the problems of the Benton Harbor public schools were the reflections of the intense social and economic polarization of the broader community,[17] in areas that the SBE and the local district had responsibility in dealing with inside the schools.

Despite the fact that the State Board was in possession of volumes of information regarding the extremely serious problems of the Benton Harbor district, information that could reasonably lead it to no other conclusion than that the district was suffering from state-imposed segregation, the State Board of Education took no action reasonably calculated to remedy these constitutional violations. The SBE's studied and intentional inaction contributed to the maintenance of segregated education in the Benton Harbor public schools. The record in this case compels the conclusion that the State Board and its Superintendent intentionally sanctioned the segregation of the Benton Harbor Area School District. The State Board's persistent failure to implement the Joint Policy Statement of 1966 has been effective notice to the BHASD of a policy of non-supervision in the area of desegregation. In light of the information possessed by the SBE and the SBE's failure to act upon that information, the BHASD Board was able to conclude that it could take actions for perpetuating Black schools without the interposition of the State Board and the State Superintendent.

It is not a pleasant task for this court to point the finger of blame toward public officials who are obviously conscientious and devoted public public servants. When, however, those officials' actions and inactions have the natural, probable, and actual result of contributing to the maintenance of segregated public education, the court has the responsibility to find liability on the part of those officials. The impact of the State defendants' inaction was stated quite simply by one former Benton Harbor school board member: [18]

". . . [We were] calling upon the State Board of Education for help. We needed help. We needed it terribly bad. We called upon the State Board of Education and didn't get an answer."

The State defendants failed in executing their constitutional responsibilities under the State and Federal constitutions.

14. See I–65 through I–74, I–76 through I–81 and the final majority and minority reports of the Committee, PXR–286 and –284. See also I–58, –59, –62, and –63.

15. I–67 at 2· 3; I–69 at 3; PXR–286 at 28–29; PXR ·287; and PXR–289. See Part III(A) infra.

16. PXR–286 at 7.

17. Id. at 13–19.

18. Nettleton, II Tr. 2914–15.

*B. The Property Transfers.*

Although the state law relative to the transfer of property from one school district to another was set out by the Court's Phase I Opinion, the examination will be summarized here because of its importance to the Phase II Opinion. Under the Michigan School Code, a county board of education (that is, the intermediate board) may, in its discretion, detach property from one district and attach it to a contiguous district upon the petition of two-thirds of the resident owners of the land to be transferred. M.C. L.A. § 340.461.[19] Only if the transfer involves more than 10% of the district's state equalized valuation (SEV) need the voters of the district losing property concur. *Id.* However, any property owner of the land considered for transfer, or any district affected by the transfer, may appeal the grant or denial of transfer by the county board to the State Board of Education. M.C.L.A. § 340.467. The appeal acts to hold the decision of the county board in abeyance until the SBE confirms, modifies, or sets aside the order of the county board of education. *Id.*

Although after consolidation there were several small attempts to transfer property out of the BHASD to contiguous districts,[20] at issue here are seven major property transfer attempts. The information relevant to these transfer petitions is as follows:[21]

[See following illustration]

**19.** Citations given are to the School Code of 1955, which remained in effect at the time of the property transfer petitions here in question. These sections have been recodified, with slight changes, in the School Code of 1976. M.C.L.A. § 380.951 *et seq.*

**20.** Coloma Exhibit (Col. Ex.) 4; I–1. These property transfer petitions and the actions taken by the Berrien County Intermediate School District (BCISD) and the SBE were as follows:

| Date | Petitioner | Position of BHASD | Position of Receiving District | No. of Children | Total SEV | BCISD Action | SBE Action |
|------|-----------|-------------------|-------------------------------|-----------------|-----------|--------------|------------|
| 9/10/65 | Spilger | Opposed | Coloma willing | 17 | $117,000 | Denied | – |
| 9/10/65 | Thumm | Agreeable | Eau Claire willing | 2 | 11,000 | Granted | – |
| 3/14/67 | Gano | Not opposed | Eau Claire not opposed | 5 | 14,000 | Granted | – |
| 9/12/67 | Demski | Opposed | Eau Claire willing | 10 | 150,000 | Denied | Denied |
| 6/25/68 | Lull | Opposed | Coloma willing | 1 | 17,000 | Granted | Reversed |
| 12/1/69 | Aldrich | Opposed | Watervliet no position | 16 | 95,000 | Denied | – |
| 7/23/74 | Watts | Opposed | Watervliet no position | 7 | 15,000 | Denied | Denied |

**21.** PXR–258.

| STATE BD. NO. | PETITION 1st FILED | PETITIONERS | INVOLVED AREA | INVOLVED DISTRICT | NO. OF CHILDREN | S.E.V. OF INVOLVED PROPERTY | INT. BD. HRING. DATE | INT. BD. DECISION | STATE BD. HRING. DATE | STATE BD. DECISION |
|---|---|---|---|---|---|---|---|---|---|---|
| C-1220 | 8/4/69 | Thomas Lynch et al. | Part of the former Eaman School District | Benton Harbor to Coloma | 150 | $2,541,878 (1.4%) | 9/30/69 | 10/2/69 Denied | 2/17/70 & 9/3/70 | Granted, trans. to Coloma 7/2/70 & 3/5/71 |
| C-1263 | 1/19/71 | Paul Freudenberg, et al. | Fairplain Area | Benton Harbor to St. Joseph | 713 | 16,800,976 (9.85%) | 3/17/71 | 3/17/71 Denied | 7/19/71 & 8/30/71 | 3/8/72 Denied |
| C-1272 | 3/26/71 | Zelma Fellner, et al. | Sodus I | Benton Harbor to Eau Claire | 400 | 9,116,251 (5.22%) | 5/18/71 | 5/21/71 Denied | 10/18/71 & 12/6/71 | 5/24/72 Denied |
| C-1277 | 4/13/71 | Chas. E. Duncan et al. | Lafayette /No. Shore | Benton Harbor to St. Joseph | 79 | 2,685,426 (1.6%) | 5/25/71 | 6/3/71 Denied | 1/24/72 | 6/28/72 Denied |
| C-1304 | 11/4/71 | Chas. Wade, et al. | Eaman/No. Shore | Benton Harbor to Coloma | 92 | 9,712,065 (5.6%) | 3/21/72 | 3/23/72 Denied | 11/20/72 | 4/11/73 Denied |
| C-1310 | 3/1/72 | (John Foley) et al. | Millburg Area | Benton Harbor to Coloma | 217 | 3,992,541 (2.2%) | 4/25/72 | 4/26/72 Denied | 1/22/73 | 5/9/73 Denied |
| C-1343 | 3/5/73 | Ilene Fox, et al. | Sodus II | Benton Harbor to Eau Claire | 143 | 4,380,092 (2.51%) | 4/24/73 | 5/2/73 Granted | 1/28/74 & 10/24/75 | 7/3/74 Granted 1/7/76 Vacate/Reverse Previous Order |

What has been called the Sodus II Petition was an inclusive portion of the Sodus I Petition that had earlier been denied. Therefore, totalling the number of children and the total SEV of the property involved in the first six petitions, it can be seen that areas including 1,661 children and comprising some 26% of the districts' total SEV were petitioning for transfer out of the district. The total enrollment and percent black for these years of the Benton Harbor Public Schools and the neighboring district to which transfers were sought were as follows: [22]

| | Benton Harbor | | St. Joseph | |
|---|---|---|---|---|
| | Total Enrollment | Percent Black | Total Enrollment | Percent Black |
| 1968–69 | 11,819 | 45.6 | | |
| 1969–70 | 11,755 | 48.6 | | |
| 1970–71 | 11,316 | 53.7 | 4,408 | 0.5 |
| 1971–72 | 10,818 | 58.7 | 4,643 | 1.4 |
| 1972–73 | 10,820 | 61.3 | 4,249 | 0.3 |
| 1973–74 | 10,638 | 65.1 | 4,183 | 0.4 |
| 1974–75 | 10,291 | 68.2 | 4,046 | 0.3 |
| 1975–76 | 10,263 | 70.7 | 4,135 | 1.3 |
| 1976–77 | 10,255 | 73.1 | 4,042 | 1.4 |

| | Coloma | | Eau Claire | |
|---|---|---|---|---|
| | Total Enrollment | Percent Black | Total Enrollment | Percent Black |
| 1970–71 | 3,051 | 0.4 | 1,212 | 16.3 |
| 1971–72 | 3,013 | 0.3 | 1,233 | 13.9 |
| 1972–73 | 3,126 | 0.4 | 1,261 | 12.6 |
| 1973–74 | 3,060 | 0.2 | 1,295 | 11.0 |
| 1974–75 | 3,038 | 0.4 | 1,316 | 8.9 |
| 1975–76 | 3,108 | 0.4 | 1,367 | 9.8 |
| 1976–77 | 3,079 | 0.3 | 1,303 | 8.8 |

These transfer activities increased in intensity as the BHASD became a majority Black district. The petitions sought transfer to districts that were either predominantly or nearly entirely White.[23] Therefore, these areas, in addition to containing some 15% of all students in the BHASD, also contained one-third or more of the total number of White students in the district.

These areas were also areas of suburban-rural character where the greatest potential growth in the district's White student population and SEV lay and contained numbers of White students who would have been in the public schools but for their parents' dissatisfaction with the Benton Harbor schools.[24]

The SBE approved two of these transfer petitions—those, involving the Eaman area and the Sodus II area. The approval of the Eaman transfer was a reversal of the Intermediate Board's denial of transfer. The facts surrounding these two transfers will next be examined.

### 1. The Eaman Transfer.

The former Eaman School District, a kindergarten through eighth grade (K–8) district, did not participate in the election on June 17, 1965 which resulted in the consolidation of the School District of the City of Benton Harbor with sixteen neighboring K–8 districts. Shortly after consolidation, however, the Eaman district voted in December 1965 by a margin of 3–1 to annex to the Benton Harbor Area School District pursuant to M.C.L.A. § 340.431 et seq.[25] In September of 1969, residents of the Eaman Area presented petitions to the Berrien County Intermediate Board bearing signatures of 90% of the resident property owners in Eaman requesting the transfer of the major portion of the former Eaman district to the Coloma Community School District. The proposed transfer was opposed by the Benton Harbor Board[26] and the Coloma Board took no position.[27] After several hearings, the Berrien County Intermediate School District (BCISD) Board voted on October 2, 1969, unanimously to deny the peti-

---

**22.** PXR–11, –12; PXR–271 to –277.

**23.** PXR–257. The SBE and its Superintendent had this information before them. SBE Stipulation at 9–12, '' 21–27.

**24.** Testimony of Lewis Gelder, transfer supporter, II Tr. 62–63. Thirty-one students from the Eaman area attended Lake Michigan Catholic School at the time of the transfer. PXR 197.

**25.** State Board of Education (SBE) Ex. 1–b. Mattheeussen testimony, II Tr. 136. This annexation added 162 students, all of them White, to the BHASD and was approved by the State Superintendent. SBE Stipulation at 4, ¶ 10.

**26.** I–30 at 5.

**27.** Col. Ex. 2 at 1. The extent of the Coloma opposition, or lack thereof, will be discussed in Part IV infra.

tion for transfer. The reasons given by one BCISD Board member in support of the denial were as follows: [28]

"1. No action or indication on the part of the Coloma Board as to whether or not they would be willing to take the students has been received by the Intermediate School District Board of Education.

2. Political alignment by township has no connection with educational programs.

3. The social, business, and church interests were minimal toward Coloma.

4. The distance to the high school of either of the school districts was about the same.

5. A very important point to be considered if this transfer were permitted is that it could set off a chain reaction whereby many other property transfer requests would be made, thus fragmenting the district.

6. The Coloma Community School District is currently crowded and the additional number of students at this time would place a burden upon the district.

7. The Coloma Community School District would face financial difficulties inasmuch as they would be responsible for the purchase of the old Eaman school building, and further, they would receive no operating taxes or state aid since the students are enrolled by the fourth Friday in the Benton Harbor School District."

The Eaman petitioners promptly perfected their appeal to the SBE and a hearing was held before the SBE-appointed Hearing Officer, Raymond Godmer. At the conclusion of the hearing, Mr. Godmer filed his report with Superintendent Porter and recommended that the SBE "uphold the action" of the BCISD and deny the transfer.[29] Dr. Porter in turn submitted the Hearing Officer's Report to the Board, also recommending the transfer be denied.[30] On June 24, 1970, however, the SBE approved a motion by Board Member Dr. Peter Oppewall and seconded by Board Member Brennan, that the SBE reverse the action of the Intermediate Board and permit the transfer to Coloma.[31] The motion was supported by Oppewall, Brennan, Deeb and Novak. Board Member Kelly abstained. Finally, Board Member Riethmiller voted "nay" for the reason that "there was no discussion as to the rationale for the motion." [32]

The Benton Harbor district registered vociferous displeasure with the SBE action and demanded reconsideration of the matter.[33] The SBE then approved a rehearing on the Eaman case, but limited the rehearing to the question of whether the Eaman school building was included in the property transfer.[34] There was, however, some confusion as to whether the rehearing was as to the school building alone or as to the entire matter. The BHASD Board and Dr. Porter felt the rehearing went to the entire matter.[35] The petitioners, of course, felt to the contrary.[36] At the rehearing, the representative of the Attorney General ruled that, "the scope of the hearing includes the

28. Minutes of the BCISD Board Meeting, October 9, 1969. I–30.

29. PXR–183.

30. PXR–184. Porter, II Tr. 715.

31. SBE Ex. 1–f; PXR–182. At the time the transfer was approved, the State Board and Superintendent were aware that the SEV per student in 1968/69 was $13,301 for the BHASD; $11,112 in Coloma; and $16,945 in the transfer area. After the transfer, the 1968/69 SEV per pupil was $12,976 for BHASD and $11,861 for Coloma. SBE Stipulation at 6, ¶ 14.

32. SBE Ex. 1–f; PXR–182.

33. PXR–188–A, –189, –190; SBE Ex. 1–g.

34. Minutes of the SBE Meeting, August 25, 1970. SBE Ex. 1–h.

35. Transcript of Hearing before SBE Hearing Officer, Statement of Attorney for BHASD, SBE Ex. 1–k at 5; Id. at 9–10; SBE Ex. 1–l.

36. Statement of Attorney for Petitioners, SBE Ex. 1–k at 6–12.

entire matter of the transfer."[37] The report of the Hearing Officer for the rehearing recommended that the entire transfer be rescinded.[38] On October 13, 1970, however, the SBE, again on a motion by Oppewall which was seconded by Brennan, modified its previous order to also include the transfer of the real property.[39] The determination of an "equitable payment" was left to be determined at a later date. Ultimately, a sum of $40,000 was determined to be "equitable."[40] That sum of money was eventually paid by the Coloma Community School District and the transfer was completed.[41]

■■ It has long been held by the Supreme Court that state and local officials may not avoid the process of dismantling a dual school system by transferring property out of a previously existing school system. *United States v. Scotland Neck Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). *See also Bradley v. Milliken,* 484 F.2d 215, 250 (6th Cir. 1973). As the Court said in *Scotland Neck,* quoting *Emporia* :

> "We have today held that any attempt by state or local officials to carve out a new school district from an existing district that is in the process of dismantling a dual school system 'must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of a dual school system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out.' *Wright v. Council of City of Emporia, supra,* [at 460, 92 S.Ct. at 2202.]" *United States v. Scotland Neck Board of Education, supra,* 407 U.S. at 489, 92 S.Ct. at 2217.

The factors to be considered by the district court in such an instance are: (1) the effect of the transfer upon racial impact; (2) whether the several schools were previously identifiably White or Black; and (3) the timing of the separation. *Wright v. Council of City of Emporia, supra,* 407 U.S. at 464–66, 92 S.Ct. 2196.

The racial impact of the transfer need not be overwhelming. In the *Scotland Neck* case, the previous county-wide system was 77% Black and 22% White. The proposed new city district would have been 43% Black and 57% White, leaving the remaining district 89% Black and 10% White. The district court had concluded that the separation, occurring while the county's school district was under a desegregation order, was "enacted with the effect of creating a refuge for white students . . . and interferes with the desegregation of the Halifax County School System." *United States v. Halifax County Board of Education,* 314 F.Supp. 65, 78 (E.D.N.C.1970).

In *Emporia* an even smaller racial impact as a result of a newly proposed district was held to warrant the intervention of the district court's equitable powers. There, the previous county-wide system was 66% Black, 34% White. The proposed new city district would be 52% Black and 48% White, leaving the remaining county district 72% Black and 28% White.

The broad language of these two cases has, of course, been limited by subsequent Supreme Court cases. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court explained that under *Emporia* and *Scotland Neck,* a plaintiff need show only discriminatory racial impact, rather than discriminatory purpose, where the "issue was whether the decision [of a school district] was consistent with an outstanding order of a federal court to desegregate the dual school system found to have existed in the area." In such instances, there is no need for the district court to find "an independent constitutional viola-

---

**37.** *Id.* at 13.

**38.** Minutes of SBE meeting. SBE Ex. 1 j.

**39.** *Id.*

**40.** Minutes of SBE meeting, November 10, 1970. SBE Ex. 1–n.

**41.** Minutes of Coloma Community School Board meeting, April 12, 1971. Col. Ex. 2 at 6.

644

tion." *Washington v. Davis, supra,* 462 U.S. at 243, 96 S.Ct. 2040.

As noted above, the actions by the SBE relevant to the Eaman transfer occurred during the period between October of 1969 and February of 1971.[42] The Benton Harbor Area School District was during the entire period this matter was before the SBE, the subject of litigation in which plaintiffs sought to prove de jure segregation, a complaint this court has upheld. Although there has been no finding of de jure segregation at the time the SBE first approved the Eaman transfer on July 2, 1970, the district, at the very least, had an affirmative duty to desegregate its teaching and administrative staff in light of Judge Kent's bench opinion. The SBE was also aware that serious problems faced the BHASD on appeal on the question of de jure segregation. Judge Kent, in effect, said: "But for the *Deal* case, I would have reached a conclusion that the plaintiffs proved de jure segregation." [43] Transfer of the Eaman area, an area that had never had a Black teacher in its school,[44] would frustrate any teacher desegregation order involving the Eaman School. The transfer met the other requirements of *Emporia* and

*Scotland Neck* in that the Eaman School was previously identifiably White upon the basis of students, faculty, and physical conditions and in that the transfer of a large, all-White area would have a substantial actual and psychological effect upon racial ratios in the district. Had Judge Kent ruled that the BHASD was de jure segregated, rather than merely inviting the Court of Appeals to so rule, the Eaman transfer could have been enjoined by this court upon the showing of the three factors mentioned above, and without proof that the transfer was motivated by a discriminatory purpose.

██ I believe the district court's equitable power should be no less where a transfer attempt is made during the course of litigation on the issue of de jure segregation.[45] To hold otherwise would be to encourage an unseemly race between parties seeking transfer out of a district and plaintiffs seeking to prove state-enforced segregation. To be consistent with *Washington v. Davis, supra,* however, the state's action could not be considered upon the question of its ultimate liability absent a showing of "an independent constitutional violation."

---

42. Minutes of SBE hearing, February 24, 1974. SBE Ex. 1–p. These are the last SBE minutes which concern the Eaman transfer.

43. Bench Opinion of Judge Kent, February 17, 1970, at 11, 13–17. As noted above, Judge Kent stated:

"[T]he neighborhood school concept as it exists in the school system which is before this Court necessarily results in the denial of equal opportunity for education to the black child who is forced because of other circumstances to attend a predominantly black school."

The court went on to state:

"If this were a case of first impression, this Court would reach a conclusion contrary to that reached by the Court of Appeals in Deal. This Court is not satisfied that it has the authority to reach such a conclusion on this record and with these findings of fact. This court is further satisfied that there is a substantial issue of law on the findings of fact upon which the court has said the plaintiffs may base a judgment, and that there is a substantial issue of law upon the findings of fact which this Court has made which would lead the Court to reach a conclusion contrary

to that reached by the Court of Appeals in Deal.

And so, any judgment that is submitted by either side, or as reached by counsel working together, may embody in it a certificate granting a right to appeal the judgment before any decree for relief is entered, under the provisions of Title 28 U.S.Code Section 1292(b). And I would suggest in that connection, gentlemen, that a copy of the opinion be appended to the application to the Court of Appeals for such appeal. It may very well be that, based upon the findings made in this case, that the Sixth Circuit Court of Appeals, if it accepts the case on that basis, will make provision for relief beyond that which might not be permitted under the Deal and Goss decisions." Id. at 18–19.

44. PXR–13.

45. *See* the Opinion of the Court of Appeals for the Sixth Circuit affirming this court's preliminary injunction against the implementation of the Sodus II transfer. *Berry v. School District of the City of Benton Harbor,* Nos. 74–2183, 74–2184 (6th Cir. Jan. 8, 1975).

In approving the Eaman transfer, this court finds such an independent violation was committed on the part of the SBE.

The "Fourth Friday" count for the Eamon elementary school for the five years it was within the BHASD was as follows: [46]

| Year | Total Enrollment | Percent White | Percent Black |
|------|------------------|---------------|---------------|
| 1965–66 | 119 | 100.0 | 0.0 |
| 1966–67 | 116 | 99.1 | 0.0 |
| 1967–68 | 81 | 100.0 | 0.0 |
| 1968–69 | 77 | 98.7 | 1.3 |
| 1970–71 | 94 | 93.6 | 6.4 |

The area was "Whiter" than it appears, for in the 1969/70 school year it became the seventh and eighth grade center for the Eaman-North Shore-Lafayette cluster of schools.[47] Therefore, Eaman's racial statistics for the years 1969/70 and 1970/71 reflect the fact that it was receiving students from two schools that averaged 5% Black over those years.[48] The children in the Eaman transfer area were, in fact, entirely White.[49]

The reasons given in testimony before this court by supporters of the Eaman transfer differ from those given at hearings at the time of the transfer and differ from the facts before this court. One supporter of the Eaman transfer was Louis Gelder who has lived in the Eaman transfer area since 1968, previously living in another area of the old Eaman School District.[50] He has been a member of the Coloma Board since 1971.[51] Mr. Gelder's children attended Benton Harbor schools for kindergarten, and then were sent to parochial schools.[52] However, after a few years in parochial schools to receive religious training, Mr. Gelder wanted his children to obtain a good vocational education and he felt that Coloma

had better vocational education than was available in the Benton Harbor schools.[53] Mr. Gelder also testified that the Eaman area was pressured to vote in favor of annexation to the BHASD when Benton Harbor refused to accept Eaman area high school students on tuition if the vote was to the contrary.[54]

Mr. Floyd Mattheeussen, a former representative in the Michigan legislature and a teacher at Coloma High School was a strong supporter of the transfer, even though he was not a resident of the transfer area. According to Mr. Mattheeussen, the Eaman area had a "right" to be in the Coloma Community Schools and the Coloma Community Schools were trying to build a base of enough students in the high school to offer a broader academic program.[55] He also stated that the Eaman district would have preferred to join Coloma, were the two districts contiguous in 1965; that Benton Harbor used duress to get the Eaman voters to favor annexation; that Benton Harbor High School is much farther than Coloma High School from the Eaman area; and that both the Eaman area and the Coloma School District are made up of "farm people," resulting in a community of interest between the two groups.[56] Fear to have their children in Benton Harbor Schools, he testified, was not a factor any of the petitioners conveyed to him as a motivation for the transfer.[57]

The reasons given by Messrs. Gelder and Mattheeussen in favor of the transfer do not agree with the facts as they come to light in the record before the court. It is not true that the Eaman residents were required to travel much farther to Benton Harbor High School than to Coloma High

---

**46.** PXR–14.

**47.** PXR–38, –82.

**48.** PXR–12.

**49.** PXR–186–B. The SBE received this information from the transcript of the rehearing of the appeal. SBE Stipulation at 9, ' 21.

**50.** Gelder, II Tr. 42.

**51.** *Id.* at 71 72.

**52.** *Id.* at 43.

**53.** *Id.* at 64–65.

**54.** *Id.* at 73- 74.

**55.** Mattheeussen, II Tr. 126.

**56.** *Id.* at 134- 37.

**57.** *Id.* at 179.

School. The two schools are in fact equidistant from the Eaman area.[58] The Benton Harbor vocational education program was perhaps the best in Berrien County.[59] There is no evidence that the BHASD exerted any pressure upon the Eaman voters to approve annexation—any incentive to annex to Benton Harbor was the product of Michigan statutes favoring consolidation of K–8 with K–12 districts. This conclusion is bolstered by the fact that the neighboring Riverside district voted to remain an independent K–8 district at this time.[60]

Nor were the Eaman residents the only "farm people" in the Benton Harbor schools. The Stump, Sodus, Pearl, Spinks Corners, Millburg, Martindale, and Johnson areas were also comprised of primarily agricultural land.[61]

The primary reasons offered by the petitioners in testimony before the SBE's Hearing Officer were far different. Mr. Gelder stated at the SBE hearing that he was concerned with the "lack of discipline," the "unconcerned parents" in the Benton Harbor system, and the increasing vandalism.[62] One witness, a real estate agent and Eaman resident, spoke of his concern over declining real estate values in the Eaman area and elsewhere in any "property which is bound by the Benton Harbor School System."[63] This witness also testified that "traveling

down into the central city location is not conducive to a good education.[64] Other petitioners also testified about the difficulty in selling property within the BHASD and of being afraid to send their children into the Benton Harbor Schools.[65]

Although most of the concerns voiced were generally limited to code words indicating fears of continuing in a majority-Black district, some witnesses openly expressed racial concerns.[66]

Also before the SBE was the testimony of representatives of the BHASD pointing out that the transfer, if approved, would destroy any further progress towards true consolidation of the BHASD, would adversely affect racial integration in the district, and would set loose a flood of other property transfer requests from the other outlying, predominantly White, areas of the district.[67] The SBE Hearing Officer, in his report to the SBE, stated that the children of the area under consideration would not receive a better education if transferred, and would not have better and safer transportation to the receiving district, and that it was questionable that the petitioning area had greater social ties to the receiving than to the losing district. Most importantly, the Hearing Officer stated that there were "socio-economic" reasons for requesting the transfer, that racial problems were

---

**58.** Benton Harbor High School is located at the corner of Empire and Colfax Avenues. PX–46. Coloma High School is located on Red Arrow Highway immediately south of the Coloma City limits. Col. Ex. 8. The distances are equal when measured on a U.S. Geological Survey Map. Eau Claire Exhibit (EC Ex.) 1. See also, SBE Ex. 1–b at 3; 1–d at 2. There was testimony before the SBE that Eaman students had traditionally attended Benton Harbor High School. SBE Ex. 1–b at 4. This was also the conclusion of the SBE Hearing Officer. SBE Ex. 1–c at 3. The SBE had stipulated that most of the consolidating K–8 districts sent their students to Benton Harbor City High School in pre-consolidation days. SBE Stipulation at 4, ¶ 8.

**59.** See, Part III(c), infra.

**60.** I–15 at 12.

**61.** Defendant BHASD Exhibit on Remand. (DXR)–A; EC Ex. 1.

**62.** SBE Ex. 1–d at 43–45.

**63.** Id. at 8.

**64.** Id. at 12.

**65.** Id. at 20–21, 28–29, 30–31, 39.

**66.** One petitioner detailed racial attacks at a junior high basketball game and complained the Board would not change policies, arguing:

"We will contend with, in our opinion, the same conditions, white children against black ones in a predominantly Negro school."

Id. at 28–29. Another petitioner testified that: "[M]y children [sic] will soon be going to junior high building and I don't feel I can allow him to go to Hull School and to the inner city."

Id. at 31.

**67.** Id. at 46–47.

involved, and that approval of the transfer would start a trend for transfer of other properties from the area.[68] Despite these warnings about the racial motivations for the transfer and the long-term implications of the transfer upon Benton Harbor as a viable, integrated school district, and despite the recommendations of its Hearing Officer, Raymond Godmer, and its superintendent, Dr. Porter, the SBE reversed the action of the Intermediate Board and approved the Eaman transfer.

The notice of these racial concerns received by the SBE at the rehearing of the matter upon Benton Harbor's appeal was even more extensive. The rehearing, held September 3, 1970, was before a different hearing officer, Mr. Roger Boline. Mr. Boline was immediately advised by BHASD's attorney, Mr. Robert Small, that he and the BHASD Superintendent and other Benton Harbor staff members had not been able to attend the initial hearing before Mr. Godmer because of their involvement in the original trial of this school desegregation case before Judge Kent. Mr. Small stated they:

> ". . . were temporarily engaged in the trial of a law suit in the federal court in Kalamazoo, wherein certain people were attempting to force racial integration on this district. We were thus engaged at the time we received notice of the previous hearing, and applied for an adjournment on these grounds. We were refused it. Mr. Sreboth was released from the court room for long enough to appear. We believe it is only fair that the record show the reason for our failure to appear at the previous hearing." [69]

As noted above, the rehearing went to the entire matter of the transfer, in light of the

ruling of the Assistant Attorney General then present. The SBE was warned again of the affect of the Eaman transfer on the continued stability of the district, the racial implications, and the danger of additional fragmentation.[70] The Hearing Officer again recommended that the SBE deny the transfer for these same reasons, noting specifically that the transfer from Benton Harbor "will increase racial segregation in that school district." [71]

As previously noted, justification for approval of the transfer appears in the SBE minutes.[72] Superintendent Porter had no recollection of any discussion in which he participated relative to reasons for reversing the denial of transfer by the Berrien Intermediate Board.[73] Marilyn Kelly, a State Board member from January 1, 1965 until January 1, 1977, testified, however, that there were "extensive and heated discussions" about the racial implications of the Eaman transfer. Ms. Kelly abstained from voting because of her concerns over the impact of the transfer on the continued stability of the district and its inability to integrate.[74] The discussion on the racial implications likely occurred at the rehearing. Board Member Dr. Peter Oppewall, who served from January 1, 1965 until January 1, 1971, was initially unsure if the racial issues were raised, but later confirmed that they were.[75] At the very least it is clear that, at the initial hearing, the Board members were aware from the Hearing Officer's report that they were transferring a large, all-White portion of a majority-Black (or nearly so) school district to a neighboring, nearly all-White, school district. The issue was also expressly raised at the time the Board received the Hearing

---

**68.** SBE Ex. 1–c.

**69.** SBE Ex. 1–k at 4–5.

**70.** *Id.* at 87–88, 91–96, 101, 105, and 123–126.

**71.** SBE Ex. 1–j.

**72.** State law has been interpreted as requiring a valid educational purpose for there to be a property transfer. Porter, II Tr. 745.

**73.** II Tr. 746. In fairness to Dr. Porter, it should be pointed out that, for the years in question, the SBE considered from 29 to 83 transfer appeals in any given year. SBE Stipulation at 12, ' 28.

**74.** II Tr. 1097, 1087-88, 1106–07.

**75.** II Tr. 2304, 2475 76.

Officer's report on the rehearing of the Eaman matter.[76]

At the very same meeting of the SBE that set a deadline for payment for the Eaman building by Coloma, a time when the entire Eaman transfer could still have been denied, the Board had the following extensive discussion of the Benton Harbor situation: [77]

"XXI. PROPERTY TRANSFERS THAT FURTHER THE SEGREGATION OF DISTRICTS.

Mr. Ronald Edmonds, Assistant Superintendent for School and Community Affairs reported to the Board on the involvement of the staff in Benton Harbor to date. He explained that the Superintendent of Schools had requested a study team from the Department to be sent to the district because of two problems: (1) violence at the secondary school, and (2) the growing number of property transfer requests from the white fringe areas to withdraw from the district and join neighboring white school districts.

Dr. Morton suggested that the Board pass a resolution indicating that, consistent with the Memorandum of Agreement between the State Board of Education and the Civil Rights Commission, the Board would not view with pleasure any property transfers that will significantly alter the racial composition of a school district and move toward further segregation. By adopting such a resolution, Dr. Morton stated that the Board would be reinforcing the position it adopted several years ago. He further said that this matter should be separated from the Benton Harbor situation.

Dr. Morton moved, seconded by Miss Kelly, that consistent with the memorandum of agreement between the State Board of Education and the Civil Rights Commission, any requests for property transfers that show evidence of significantly militating against the integration of a school district and/or moving in the direction of greater segregation, would be looked upon as contrary to state policy, and, further, that this action be forwarded to the Attorney General for review.

Mr. Deeb questioned the use of words like 'significant' and 'contrary to state policy,' in the motion. He said that if the staff, in making a recommendation to the Board about a property transfer, reported that a certain number of people involved in the transfer comprised a significant number, then the Board would be placed in a position where it had to deny the transfer on the basis of segregation. He said he had no objection to the policy except that it might prejudice the Board in terms of property transfers. Dr. Porter stated that that was a legal question and he would not be able to respond to whether or not the words 'contrary to' would place the Board in a prejudicial position in regard to property transfer cases that come before it. Mr. Deeb commented that it would be appropriate to ask the Attorney General to inform the Board whether such action would place the Board in a prejudicial situation.

Mr. Brennan stated that he had no objection to the motion but he felt it was redundant because the Board took a position, when it passed a resolution with the Civil Rights Commission, opposing segregation and in favor of affirmatively creating integration. He said this issue came up because of the property transfer in the Benton Harbor Area. He emphasized that it is his intention to review every case before the Board on its own merits.

Mr. Brennan said that the word 'significantly' is important. The Board, not the staff, should determine what is meant by 'significantly.' He said there may be sound educational reasons for making a transfer, but if it would cause a change in the racial balance, the motion implies that such a transfer cannot be made. He stated that the original property transfer

76. SBE Ex. 1–i.

77. Minutes of February 10, 1971 Board Meeting. SBE Ex. 10. *See also* Porter, II Tr. 716–17.

in Benton Harbor that has taken place did not significantly change the racial balance. Other requests for transfers have been made as a result of that one, but the Board must consider them as they are presented.

Mrs. Miller stated that a racial balance of 50–50 is dangerous because it can change very rapidly in one direction and the Board should not not encourage this type of imbalance. Miss Kelly said that 80 children were involved in the Benton Harbor property transfer case and numbers, rather than percentages, become significant.

Mr. O'Neil said he agreed with the need for the motion. He felt it was important that the proposed motion receive the review and concurrence of the Attorney General.

Mr. Brennan indicated he would vote for the motion, but he wanted the minutes to reflect that the interpretation of the word 'significant' is not unanimous on the Board.

Dr. Porter stated that the resolution will be reviewed by the appropriate staff in the Attorney General's office to see that it is educationally and legally supportable.

Ayes: Brennan, Deeb, Kelly, Miller, Morton, Novak, O'Neil, Riethmiller.

The motion carried."

About this same time the Board also adopted a policy that it would not transfer property from districts involved in litigation. Dr. Porter recalls the policy as being informally adopted in 1973. Board Member Kelly, however, claims this was an unwritten policy of the Board as early as 1970. This policy is now included within the Board's Official "By-Laws and Procedural Policies."[78] The court finds that the Eaman transfer violated the Joint Policy Statement issued by the State Board and the Civil Rights Commission and was also inconsistent with the unwritten (and later formalized) policies of the Board not to transfer property from districts under litigation and not to transfer property where there is evidence the transfer will significantly militate against integration.

Also, despite a Board policy that no extraneous material be considered by the Board, outside of the Hearing Officers' Report and the transcript of the hearing,[79] there was substantial ex parte contact between members of the Board and supporters of the transfer, most notably from former State Representative Mattheeussen.[80] The Board, on a motion by Dr. Oppewall, at one point tabled consideration of the Eaman transfer at the request of the Eaman petitioners for more time to prepare their appeal.[81] Although Dr. Oppewall found Mr. Mattheeussen's reasons (given ex parte) in support of the transfer persuasive, a reading of the Hearing Officers' summaries of the hearings or a reading of the transcript of the hearings (both of which Dr. Oppewall claims to have read)[82] would indicate that the primary motivation of the Eaman petitioners was a desire to escape the increasingly-Black Benton Harbor public schools. Dr. Oppewall, and presumably the other SBE members, *in voting to approve the transfer, were acting upon information not a part of the record before them and information that was in substantial conflict with that of record.*

Peter Oppewall and the majority board members substantially adopted Mattheeussen's oral presentation and disregarded the statutory procedure for appeals and all of the testimony, documents and exhibits of two Hearing Officers, and Superintendent Porter's recommendations as well.

 As was stated in the Phase I opinion in this matter:

"A presumption of segregative intent arises when plaintiffs establish that the natural, probable and foreseeable result

---

78. Porter, II Tr. 717–18; Kelly, II Tr. 1098–99. PXR–256.

79. Porter, II Tr. 736.

80. Oppewall, II Tr. 2267, 2269, 2319–21.

81. SBE Ex. 1–e; Oppewall, II Tr. 2269.

82. Oppewall, II Tr. 2272–76, 2279, 2292.

of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies. *Oliver, supra,* 508 F.2d at 182; *Keyes* [413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548], *supra; Bradley v. Milliken,* 484 F.2d 215 (6th Cir. 1973) (en banc), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Davis v. School District of Pontiac,* 443 F.2d 573 (6th Cir. 1971), aff'g. 309 F.Supp. 734 (E.D.Mich.1970)." *Berry v. School District of the City of Benton Harbor,* 442 F.Supp. 1280, 1294–5 (W.D.Mich.1977).

As to the Eaman transfer, plaintiffs established a presumption of de jure segregative intent. They established to the satisfaction of the court that the Eaman transfer by the State Board of Education had the natural, probable, foreseeable, and actual result of increasing de jure segregation of the Benton Harbor public schools. Defendant SBE failed to establish that the Eaman transfer was a consistent and resolute application of racially neutral policies. In light of the wealth of information before the SBE, the warnings that the transfer would increase segregation in Benton Harbor, and the lack of valid educational reasons for the transfer, this court cannot conclude otherwise than that the action was taken with the conscious intent of creating a refuge for White students seeking to escape a predominantly Black district.

The segregative effect of the Eaman transfer upon the Benton Harbor district went far beyond the loss of the 150 White students from the BHASD to the Coloma Community School District. Before the SBE next acted on a petition for transfer of property out of the BHASD, five other transfer petitions totaling some 1500 students and some 24.5% of the district's total SEV had been filed.[83] As noted above, these areas which were seeking transfer were all predominantly White, outlying areas of the district.

The transfer and subsequent petitions created a period of chaos for the Benton Harbor school administration. They were unable to plan for the future, not knowing which areas of the district would remain within the district. Long-range plans to improve the curriculum and the building plant, developed by the professional educational planners of Englehardt and Englehardt, Inc., were shelved.[84] A scheduled bond election for major capital improvements was cancelled.[85] The District was forced to continue with inadequate, overcrowded secondary schools which contributed to the increasing tensions within the district and exacerbated White flight from the district. This was in a district where all witnesses agreed that consolidation without a successful building program would be disastrous.

Defendant SBE's expert witness, Dr. Laverne Boss, testified that a loss to a school district of an area similar to Eaman, that is 1.4% of its total students and total SEV, would be "insignificant" in terms of its impact upon education and educational administration in the district.[86] Dr. Boss, the former Superintendent of the 3,000 student Northview School District, testified that when Northview lost 30% of its district to the expanding Grand Rapids School District, they were able to "work it out" and the loss did not damage the remaining district.[87] The situation in Northview, however, was radically different from the situation faced by the Benton Harbor adminis-

---

**83.** PXR–258.

**84.** PXR–8 and - 190 at 2. *See,* The Englehardt Report, PXR 59.

**85.** PXR- 53 at 5. The February 1971 Newsletter of the Michigan School Business Officials editorialized that the SBE decision allowing the transfer was a "most outstanding example of conflict between SBE policy and SBE action" and that the effect of the transfer would be to increase segregation in the Benton Harbor district PXR -253.

**86.** Boss, II Tr. 3435.

**87.** *Id.,* at 3436 37.

tration. Northview, a 98%-plus White district (as were the three other districts Dr. Boss has been superintendent of), was in a rapidly growing area outside Grand Rapids.[88] Benton Harbor was a majority-Black district facing declining population and deteriorating property values. Northview was not crippled by the racial motives that infected the Benton Harbor transfers.

Dr. Boss's testimony that a transfer such as the Eaman transfer would have an "insignificant" impact upon education in the BHASD was firmly rebutted by plaintiffs' expert witness, Dr. Robert Green. Dr. Green is an eminent educational psychologist and expert upon segregation and its impact on both Black and White children.[89] Dr. Green testified that the transfer of a predominantly White area from a predominantly Black district to a predominantly White district would have both an educational and a psychological impact: [90]

"... The educational impact is very often clear in that services, resources, materials, consultants that are directed to districts, that minority pockets in those districts usually receive fewer resources, fewer services, and can be signaled out and targeted for inferior educational services. From an educational standpoint, that happens.

From a psychological standpoint, it says to Black students that those who are in administrative leadership roles in that district would wish to continue the practice of separation, separating young people, using race as a criteria for that separation. That has a negative impact on Black students in that they begin to view themselves as being unworthy; and it allows White students very often to develop a very unrealistic perception of their own self worth."

Where that transfer receives the approval of the highest educational and political bodies in the State, it communicates to all involved that "separation by race in the context of public education is acceptable and should be facilitated.[91] As Dr. Green further testified: [92]

"[I]f you moved children for reasons over matters that the children cannot control, and you have exhausted all the options, and they're moved for a definable educational benefit, that's acceptable. But you could move two children for racial reasons or for reasons that are identified as being for racial reasons, . . . once that is known and given visibility, that would have an impact as great as moving 50 percent of the kids."

Although the percentage increase in racial concentration as a result of a transfer may be negligible, if the transfer is done for racial reasons it becomes a strong symbolic act.[93]

Such a broad and deleterious impact as a result of a transfer such as that approved by the SBE with regard to the Eaman area can hardly be termed "insignificant." With all due respect for Dr. Boss's expertise, the court finds the approval of the Eaman transfer petition by the SBE was a devastating blow to the Benton Harbor public schools, a blow from which they have yet to recover.

Finally, the transfer destroyed morale within the district. Residents no longer saw the Benton Harbor Area School District as a consolidated district. The goal of working towards a successful, unified dis-

---

88. *Id.* at 3437.

89. Dr. Green also testified at the original trial held in this action before Judge W. Wallace Kent. His testimony there was with regard to "tracking" programs, intact bussing, the effect of racial containment, and other matters. Judge Kent, in his bench opinion, stated that he "was impressed by the conclusions and the opinions" of Dr. Green. Bench Opinion at 13. Although I believe that the added defendants' opportunity to cross-examine Dr. Green during these Phase II proceedings opens his testimony before Judge Kent for review by this court, I have in no way relied upon that testimony in considering the liability of the added defendants.

90. Green, II Tr. 4420, 4429.

91. *Id.* at 4423.

92. *Id.* at 4510–11.

93. *Id.* at 4534.

trict was forgotten as nearly one-quarter of the district scrambled to get out.[94] Rather than planning for the future and attempting to resolve the substantial problems of the Benton Harbor district, the outlying areas were given the hope that they could "cut and run" for the safe harbors of St. Joseph, Watervliet, Coloma, and Eau Claire. The Supreme Court's language in *Emporia, supra,* is appropriate here:

"[A] [district] court supervising the process of desegregation [does not] exercise its remedial discretion responsibly where it approves a plan that, in the hope of providing better 'quality education' to some children, has a substantial adverse effect upon the quality of education available to others." *Wright v. Council of City of Emporia, supra,* 407 U.S. at 463, 92 S.Ct. at 2204.

### 2. The Sodus II Transfer.

After approving the Eaman transfer, the SBE denied five successive petitions for transfers of substantial portions of property out of the Benton Harbor district. The SBE broke this pattern, however, in 1974 when it granted what has become known in these proceedings as the Sodus II transfer. The BHASD Board and the Berrien Intermediate Board also changed positions when the Sodus II petition came before them. After a hotly contested school board election, new members were elected and the board then voted "not to oppose" the petition.[95] The Intermediate Board, after denying all other major property transfer petitions out of Benton Harbor, granted the

Sodus II petition.[96] This decision was then appealed to the SBE. Implementation of the Sodus II transfer was enjoined by this court, the injunction being affirmed by a panel of the Court of Appeals for the Sixth Circuit. Finally, on January 7, 1976, the SBE vacated and reversed its previous order transferring Sodus II.[97]

The actions of the BCISD in approving the petitions will be discussed later. The events leading up to the change of position on the part of the BHASD Board were extensively examined in this court's Phase I opinion. To summarize briefly, the composition of the majority on the Benton Harbor Board had been changed by the election of new members who looked favorably upon attempts by property owners to transfer out of the district.[98] The BHASD resolution not to oppose the Sodus II transfer stated it was "not inconsistent with a general plan for redistricting" the BHASD and was approved coincidentally with the presentation of two plans for redistricting the BHASD.[99] One of those two plans was the "Gargano Plan," a blatant attempt to create two separate and unequal school districts out of Benton Harbor: one rich and White; the other, poor and Black.[100]

The Sodus II petition was filed with the BCISD on March 5, 1973. The area covered by the petition was a peninsula in the extreme Southeast portion of the district, composed of the formerly independent Chadwick, Sodus, and Mt. Pleasant school districts. The area, in addition to comprising some 2.5% of the BHASD's total SEV,

---

**94.** Sreboth, II Tr. 2022.

**95.** Phase I Opinion, 442 F.Supp. at 1330–35.

**96.** *See,* Part III(b), *infra.*

**97.** SBE Ex. 7–b.

**98.** *E. g.,* Philip W. McDonald was a petitioner in the North Shore/Lafayette petition to transfer to the St. Joseph School District. He spoke before the SBE hearing on the matter, voicing concern over the increasing concentration of racial minorities in the BHASD. He ran for and was elected to the BHASD Board in 1972 while his petition for transfer was still pending before the SBE. II Tr. 581 87. Bernard R. Beland was a petitioner in the Fairplain petition

to transfer to St. Joseph. He appeared at the SBE hearing in favor of the petition. He campaigned for and was elected to the BHASD Board on a platform that, where the majority of voters in an area sought a transfer, the transfer should be granted. II Tr. 618–20. Edward Bentley was also a petitioner in the Fairplain transfer petition and spoke in favor of it at the SBE hearing. He was elected to the BHASD Board in 1971 and has been its President since 1972.

**99.** PXR–80.

**100.** PXR 84; SBE Ex. 7–c at 21.

contained some 143 BHASD students, of whom 19 were Black.[101] The BCISD granted the petition on May 2, 1973.

An appeal from this decision was filed with the SBE by Ilene Fox, a BHASD Board member from 1969–1977 and a resident of the petitioning area.[102] As in the Eaman transfer, the SBE Hearing Officer, Raymond Godmer, recommended that the transfer be denied on the basis that it would adversely affect Benton Harbor racially and financially, would set a precedent for other attempts to fragment the district, and because "no sound educational reasons for the transfer were presented."[103] The SBE, however, again overrode the recommendation of its Hearing Officer and Superintendent Porter and on July 3, 1974, affirmed the decision of the BCISD to grant the transfer.[104]

By 1974, the SBE had, at Dr. Porter's urging, initiated a policy that, where the Board overrode the Superintendent's recommendation on a property transfer matter, reasons for the SBE decision would be placed in the record.[105] The reasons specified by the Board in approving the Sodus II transfer were:[106]

"a. Dual sessions are on [sic.] educational hardship and disruptive to the ordinary educational process. The sending district has given no indication that the dual sessions would be of short duration. The transfer would not present crowding problems for the receiving district.

b. All three boards involved agree with the transfer.

c. The change in attendance area would be minimal because (a) early elementary students would continue in their local building, and (b) many students already attend the receiving district as tuition students.

d. Duplication of bus routes would be eliminated. Transportation would be simplified.

e. The transfer would not substantially change the racial composition of either district.

f. The property in question is located in the sending district, not on local initiative, but as a result of a county-wide vote on a state plan.

g. Transfer area has three sides contiguous with the receiving district."

It is difficult to tell from an examination of the record where the SBE obtained the facts upon which its reasons in support of the transfer were based. The transcript of the hearing before Mr. Godmer[107] is replete with testimony that approval of the transfer would result in increased segregation in the Benton Harbor district. Mr. Robert Small, attorney for the appellants and former BHASD attorney, warned that the transfer would be an act of de jure segregation.[108] The racial implications of the transfer were also raised by Appellants Fox[109] and Joseph,[110] the Benton Harbor Educational Association,[111] and the Twin City Branch of the NAACP.[112] The appellees (petitioners) offered no testimony in their

101. PXR–257, –258. The SBE and Superintendent were aware of the racial composition of the areas involved. SBE Stipulation at 11–12, ¶ 27.

102. Fox, II Tr. 2140–41, 2167.

103. PXR–103.

104. At the time the Sodus II transfer was approved, the SBE and Superintendent were aware that the SEV per student in 1971–72 was $15,498 in BHASD; $11,693 in Eau Claire; and $30,630 in the transfer area. Had the transfer been effected, the 1971–72 SEV per pupil would have been $15,418 for Benton Harbor and $12,961 for Eau Claire. SBE Stipulation at 8, ¶ 20.

105. Porter, II Tr. 747, 763.

106. PXR–102.

107. SBE Ex. 7–a(c).

108. *Id.*, at 8–9, 142–46.

109. *Id.* at 21.

110. *Id.* at 48–50. Mr. Joseph was a Black resident of the Sodus II area.

111. *Id.* at 58.

112. *Id.* at 95–97.

behalf, only a prepared statement by their attorney. Appellees offered no sound educational reasons for the transfer and, in fact, conceded that the Benton Harbor curriculum was superior to Eau Claire's.[113] The sole argument in favor of the transfer was that Benton Harbor High School was on split sessions and the Sodus residents would feel more comfortable in the smaller, more rural, Eau Claire district.

The appellee's attorney argued that there would be no significant segregative effect on the BHASD as Benton Harbor, if past trends continued, would grow "Blacker" regardless of the transfer.[114] This led appellant's attorney to respond: [115]

"Now, the argument of Mr. Jones at this point is essentially cynical. In effect he is saying well, you are going to become—I detest the expression—'You are going to become more black as the years go on, why don't you let us out now because he says it will only be a little bit unconstitutional, the change for this particular petition is going to be only a little bit.' There is a popular expression about pregnancy that I am not going to make. I am only going to say that it is impossible to be a little unconstitutional. The thing is either constitutional or it is unconstitutional and in the words of Mr. Joseph: 'Anytime you transfer a predominantly white group of children out of a district which is 66% black and 25% white or thereabouts'—I care little about the actual figures—'whenever you do that and transfer that group into a predomi-nately white district you are unconstitutional.' "

The transfer of a large area, nearly 90% White, from a district that is 65% Black to another school district that is more than 90% White cannot be said to have an insubstantial impact upon the integration of the losing district.

The reasons behind the BHASD Board's "approval" of the transfer have already been discussed. As to reasons (c) and (d) given by the SBE in support of its decision (that many students in the area were already tuition students at Eau Claire and that bus transportation would be simplified), these do not adequately reflect the true state of affairs. Petitioners argued that the transfer would eliminate duplication of bus routes in the Sodus II area. The duplicated bus routes, however, were a result of the fact that Eau Claire had 96 Benton Harbor tuition students from the Sodus II area and those students were picked up in Eau Claire busses.[116] Of these, 26 were elementary students, 26 middle school students, and 44 were high school students.[117]

In the early 1970's, Eau Claire increasingly became a refuge for tuition students who were residents of the Benton Harbor district. Students who were residents of the BHASD and attended Eau Claire schools on tuition greatly exceeded the number of Benton Harbor residents attending school on tuition at any other nearby district: [118]

113. Id. at 127. The Eau Claire district had not yet been accredited. Id. at 61. Benton Harbor, meanwhile, offered a substantial amount of testimony as to the quality of its curriculum and its substantial academic improvement as reflected in recent test scores. Id. at 29–39, 42, 56–58.

114. Id. at 121.

115. Id. at 143–44.

116. Id. at 62. The travel distances between the Sodus II area and the Benton Harbor and Eau

Claire schools were approximately the same. PXR–103 at 1.

117. SBE Ex. 7–a(c), at 115–116.

118. PXR–299. Over the years given, the total number of tuition students from Benton Harbor to other districts was 633. For the same years, the number of tuition students from other districts attending Benton Harbor schools totaled only 4. Id.

From BHASD to:

| Year | Eau Claire | Coloma | St. Joseph | Watervliet | All Others |
|---|---|---|---|---|---|
| 1970–71 | 17 | 0 | 0 | .0 | 0 |
| 1971–72 | 30 | 1 | 0 | 0 | 4 |
| 1972–73 | 37 | 1 | 6 | 0 | 1 |
| 1973–74 | 109 | 7 | 0 | 1 | 2 |
| 1974–75 | 142 | 1 | 0 | 2 | 2 |
| 1975–76 | 149 | 2 | 4 | 0 | 2 |
| 1976–77 | 107 | 1 | 0 | 0 | 5 |

Under M.C.L.A. § 340.582 (M.C.L.A. § 380.1401 under the 1976 School Code), the board of any school district may admit to the district nonresident pupils and collect tuition therefrom. Although no direct evidence of the race of these tuition transfer students was offered by any party, a comparison of Eau Claire enrollment statistics with the tuition transfer statistics requires this court to draw the inference that the vast majority of these students was White.[119] The SBE was aware of the extraordinarily high number of tuition students from Benton Harbor attending Eau Claire by virtue of the annual "Check Sheets" for certification of tuition payments by non-resident students which Eau Claire was required to submit to the SBE each year.[120]

A policy which allows transfer from racial minority to racial majority schools, even when restricted, is tantamount to an authorization for White students to flee and is a means for the perpetuation of segregation, and it is in fact a segregative action. *Davis v. Board of School Commis-*

*sioners,* 414 F.2d 609 (5th Cir. 1969); *Monroe v. Board of Commissioners,* 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *Goss v. Board of Education,* 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). The SBE offered no evidence of any policy on its part aimed in any way at restricting the use of non-resident tuition procedures to prevent its abuse, as evidenced here, by White students seeking to flee a majority Black district. The SBE's inaction in this area is probative of the State Board's discriminatory intent. The fact that the Benton Harbor students were already using the Eau Claire schools as a refuge was not a valid consideration for transferring the entire area to Eau Claire.

As mentioned above, no sound educational reason for the transfer appears in the transcript of the hearing. The Sodus petitioners offered no testimony, only the statement of their attorney. Nor were any of the exhibits offered by the petitioners calculated to reflect a sound educational reason for the transfer.[121] Hearing Officer Godmer considered it "questionable" that

119. PXR–271 through –277, –299. The enrollment statistics for Eau Claire are as follows:

| Year | Black Students | Other Minority | White Students | Tuition |
|---|---|---|---|---|
| 1970–71 | 197 | 85 | 930 | 17 |
| 1971–72 | 171 | 110 | 952 | 30 |
| 1972–73 | 159 | 128 | 974 | 37 |
| 1973–74 | 143 | 122 | 1030 | 109 |
| 1974–75 | 117 | 120 | 1079 | 142 |
| 1975–76 | 134 | 169 | 1064 | 149 |
| 1976–77 | 115 | 162 | 1026 | 107 |

As can be seen, as the number of tuition students increased, the number of White students in the district increased a comparable amount and the number of Black students actually de-

creased. For instance, between the 1972/73 and 1973/74 school years, the number of tuition students from Benton Harbor increased by 72 students. Eau Claire's White student population increased 56 and Black student population decreased by 16 students. The only reasonable inference is that the number of White tuition students from Benton Harbor far exceeded the percentage of White students in BHASD (35%). PXR–12.

120. PXR–292 through –298. Eau Claire's 1973/4 "Check Sheet" to the SBE shows that 109 of its 111 tuition students were residents of Benton Harbor. PXR–295.

121. SBE Ex. 7–a(c) at page 3 of transcript.

the transferred students would receive a better education, have a better academic program, or receive ancillary educational growth if transferred to Eau Claire.[122]

The SBE also had before it the minutes of the BCISD hearing on the transfer.[123] Petitioners at this hearing spoke primarily of their fears of attending Benton Harbor schools and their desire to attend school in a smaller, rural environment. At this hearing Mrs. Fox, Mr. Joseph, several other district residents, the President of the local branch of the NAACP, the District Director of the Michigan Department of Civil Rights, a representative of the Benton Harbor Education Association, and former BHASD Board members all warned of the detrimental effect the transfer would have on integration in the Benton Harbor schools. Dr. Harzel Taylor, a long-time BHASD Board member, warned explicitly that transfer would result in litigation for violation of the Fourteenth Amendment.[124] The Twin City Area NAACP also wrote members of the SBE directly, warning them that the organization would regard transfer of the area as an unconstitutional act.[125] The SBE was not laboring in a vacuum when it voted to affirm the BCISD and transfer the Sodus II area.

The Sodus II petition included much of the same area as the Sodus I petition, denied by both the BCISD and the SBE in 1971–72. The Sodus I (Fellner) petition included some 400 students and 5.2% of Benton Harbor's total SEV.[126] In addition to the former Sodus, Chadwick, and Mt. Pleasant school districts included in the So-

dus II petition, the Sodus I petition included the former Stump School District which lay to the west of the Sodus area and along the southern boundary of the BHASD.[127] Of the 400 students involved, 70% were White and 30% were Black. At this time, BHASD was 53.7% Black and Eau Claire was 16.2% Black.[128]

The BCISD failed to approve the Fellner petition when it deadlocked on a motion to defer action on the petition until it had received the final report of the "Blue Ribbon Committee" formed to examine the problems of the Benton Harbor schools.[129] Hearing Officer Godmer also heard the Sodus I petition and recommended that it be denied.[130] The SBE on May 24, 1972 voted unanimously to deny the transfer.[131] No reasons for the denial appear in the SBE minutes. The Hearing Officer, however, had pointed out the impact the transfer would have on the racial composition of the Benton Harbor schools and that approval would set a precedent for future requests for transfer.[132]

Approval of the Sodus II transfer was in violation of several of the SBE's own policies—policies designed to prevent segregation in Michigan public schools. The transfer violated the Joint Policy Statement of the SBE and the Michigan Civil Rights Commission.[133] The transfer was not consistent with the Board's policy, adopted in 1971, prohibiting "property transfers that show evidence of significantly militating against the integration of a school district and/or moving in the direction of greater segregation."[134] Finally, approval of the

122. *Id.* at 4.

123. I–45.

124. *Id.* at 16. See also the statements presented at the SBE Hearing by Joseph, PXR–109, and the NAACP, PXR–112.

125. PXR–105.

126. PXR–257 at 3. The Stump-Alma School was 100% Black when it was closed in 1968. The other former Stump District school, Stump-Nickerson, was only 24% Black that same year.

127. *See* map, P 48; PXR 258.

128. PXR–257 at 3.

129. I–36.

130. SBE Ex. 3–a.

131. SBE Ex. 3–d.

132. SBE Ex. 3–a.

133. PXR–251. See discussion of the Joint Policy Statement, *supra* at 6.

134. SBE Ex. 10.

transfer was inconsistent with the Board's informal policy of not approving transfers from districts involved in litigation.[135]

The natural, probable, and foreseeable result of the SBE's action in approving the Sodus II transfer would be to increase and perpetuate segregation in the Benton Harbor Area School District. Defendant SBE has failed to show that the approval of the Sodus II transfer was the result of a consistent and resolute application of racially neutral policies. No sound educational reason existed for the transfer. The only plausible educational reason for the transfer would be the existence of split sessions at Benton Harbor High School. Yet these same split sessions were in existence at the time of the five previous denials by the SBE of transfer requests out of Benton Harbor.[136] The Sodus area high school students would be transferred from an accredited high school to an unaccredited high school. The court concludes that the purpose and intent of the SBE's approval of the Sodus II transfer was to allow White residents of the Sodus area to escape from a majority-Black school district the White residents no longer felt comfortable in attending.

■ The court is highly sympathetic to the position of parents who perceive, correctly or incorrectly, that they have lost control over their children's education. Were race not a factor, the desire of the Sodus II residents to transfer to a smaller, more rural-oriented district would be for the State Board of Education to decide upon standard educational policies and would not concern this court. However, where race appears to be the motivating factor in the residents' desire to transfer, any action by any state agency to facilitate that desire demands the strictest scrutiny of this court. This court would not serve the mandate of the Constitution if it were to approve a transfer, achieved with discriminatory intent, that, in the hope of providing a more "compatible" educational environment for some children, had a substantial adverse effect upon the quality of education available to those remaining within the district and resulted in increased segregation in the remaining district.

The State Board of Education would argue that because the Sodus II transfer was never implemented, due to this court's order, and has, in fact, been vacated by a later ruling of the SBE,[137] no effect from the transfer has resulted to Benton Harbor. Defendants also argue that the Sodus II approval did not set a precedent as no further major property transfer attempts have been made since that time.[138] The court

135. Although Dr. Porter could not recall if this policy had been adopted at the time of the Sodus II transfer approval, II Tr. 717–18, Board Member Kelly recalled that the Board was already operating under the policy at that time. II Tr. 1098–99. Although the instant case remained pending before the Sixth Circuit Court of Appeals at the time of the approval, no mention of the *Berry* case was made at either the BCISD nor the SBE hearings.

The plaintiffs and the State defendants stipulated that Eugene Krasicky, Assistant Attorney General in charge of the Division of Education and Retirement in the Michigan Attorney General's office and principal legal advisor to and attorney for the SBE and the Superintendent, would testify that he first learned of the instant case some time during April-June, 1971, during the trial of the Detroit school desegregation case and was informed at that time that several property transfer petitions involving the BHASD were pending. Mr. Krasicky would testify further that he promptly met with the SBE and Superintendent in executive session, informed them that in his opinion it would be ill-advised for the SBE to grant property transfers from a school district that was a defendant in school desegregation litigation. Krasicky Stipulation at 1–2. There is no evidence that the Attorney General's office advised the SBE that the appeal in the instant case remained pending before the Sixth Circuit during the course of the Sodus II proceedings.

136. Ironically, the Eaman area was transferred to Coloma at a time when many of the Coloma schools were on split sessions. *See* Part IV, *infra.*

137. SBE Ex. 7–b.

138. The only transfer petition filed since July 3, 1974 was the Watts petition (7 children, $15,475 SEV) heard by the BCISD on July 23, 1974. The petitioners sought transfer from BHASD to the Watervliet School District. Benton Harbor objected, Watervliet had a "position of neutrality," and the BCISD denied. Mr. Watts appeal-

expressly rejects such contentions. The most likely explanation for the lack of further property transfer petitions concerning the BHASD is this court's injunction against implementation of the Sodus II transfer. Nor can it be said that, because the transfer was aborted, there can be no effect upon the Benton Harbor District. The health of a district such as Benton Harbor is not measured by raw numbers alone. The consolidated Benton Harbor Area School District has been a fragile creature since its creation in 1965. Approval of the Sodus II transfer, like that of the Eaman transfer, was a crippling blow to the unity of the district. The transfer again gave hope to those persons who felt the way to solve the district's problems was to run from those problems rather than face the difficult task of resolving the problems amongst themselves.[139] The district, after July 3, 1974, again faced the nearly impossible task of making its residents see themselves as members of the same, unified community with the common goal of quality education for all children.

Finally, as testified to by plaintiffs' expert witness on rebuttal, the approval of a transfer of a predominantly White area to a predominantly White district from a predominantly Black district adversely affects both Black and White students.[140] The approval, particularly where approved by the highest educational body in the State, reinforces concepts of inferiority among Black students and exaggerates false notions of superiority among White students. It conveys the impression that the body responsible for all public school students in the State condones the separation of those students upon the basis of race. The vacation of the approval of transfer, particularly where that action comes after a court injunction restraining the transfer, cannot undo that adverse psychological impact.[141]

■ The Benton Harbor schools became the focus of the wider problems of the community—a community that has been becoming increasingly polarized on the basis of wealth and race.[142] The State Board of Education failed miserably in its constitutional duties to assist the Benton Harbor public schools resolve the problem of segregation in those matters over which it had control. The SBE, rather than helping to assist in resolving the many problems of the BHASD, served primarily to compound those problems. By its actions and inactions, the State Board of Education has helped to create and maintain the segregated conditions which exist today in the schools of Benton Harbor.

## II. The State Boundary Commission.

The State Boundary Commission (SBC) was added as a party to these proceedings by means of plaintiffs' Supplemental Complaint. The complaint, a result of a petition by the residents of an area within the BHASD to form a new "City of Fairplain," alleged that the proceedings were: [143]

ed to the SBE but failed to appear at the State hearing. The SBE voted to uphold BCISD decision on February 5, 1975.

**139.** Testimony of Lester Page, former President of the BHASD Board, II Tr. 1033–34.

**140.** See Part I(B)(1).

**141.** Green, II Tr. 4431–32. The reason given by the SBE in vacating the Sodus II transfer was as follows:
"The State Board of Education, as a matter of policy, does not grant or affirm property transfers when a school desegregation case is pending with regard to any district involved in the transfer. Although the *Berry* case was pending at the time of the original proceedings before the Hearing Officer with regard to this transfer, this fact was not known to the Hearing Officer and was not brought out in the testimony, and, thus, not called to the attention of the State Board of Education. Therefore, because of lack of notice of the pendency of the *Berry* case, the State Board of Education acted contrary to its policy in affirming the granting of the transfer." PXR–122.
The reason offered by the SBE gives no indication that the original transfer was improper in any way, only that they were unaware of the pending litigation. Such a statement is hardly reassuring to Black students who had their self-worth assaulted by the earlier approval.

**142.** See the report on "The Demography of the Benton Harbor School District," EC Ex. 20.

**143.** *Plaintiffs' Supplemental Complaint at 10.*

"a scheme and artifice to eventually facilitate and effect the separation of the Fairplain area from the school district of the City of Benton Harbor, and that the Municipal Boundary Commission will proceed to implement said scheme unless restrained from doing so by this Court." Plaintiffs further alleged that incorporation of what they claimed would be a "separate, virtually all-white, municipality" would "further intensify the problems of racial discrimination and segregation existing within the school district and the City of Benton Harbor, Michigan." [144] After the close of plaintiffs' proofs, this court granted, pursuant to Fed.R.Civ.Proc. 41(b), defendant State Boundary Commission's Motion to Dismiss.[145] I will now explain the reasons for that dismissal.

The SBC is an agency of the State of Michigan created by, and with the powers and duties under, 1968 P.A. 191. M.C.L.A. § 123.1001 *et seq.* The Act creating the SBC amended and replaced certain provisions of the Home Rule Cities Act, M.C.L.A. § 117.1 *et seq.*, relating to the procedures for the incorporation of home rule cities. There are five Commission members who determine each matter: three "State" members appointed by the Governor and two "County" members appointed by the chief probate judge of the county where the area in question lies. M.C.L.A. §§ 123.-1002, .1005.

Petitions for the incorporation of a city are filed with the SBC. Upon the determination that the petition satisfies legal requirements, a public hearing to determine "the reasonableness of the proposed incorporation" is scheduled. M.C.L.A. § 123.-1008. The Act sets out eighteen criteria for this determination, among them population density, land area and land uses, assessed

valuation, and the need for organized community services. M.C.L.A. § 123.1009. The Commission may then approve, deny, or revise the boundaries of the petitioning area. Denial of a petition is final. Approval of a petition or a revised petition may be challenged by a referendum petition filed by residents of the affected area. If a proper referendum petition is filed, an election on the matter must be held. If incorporation is finally approved by either the SBC or a majority of the voters, charter commission elections and proceedings are begun under the Home Rule Cities Act. M.C.L.A. § 123.-1010.

Petitions seeking the incorporation of the City of Fairplain were filed with the SBC on October 8, 1973.[146] The boundaries of the proposed city follow quite closely the boundaries of the former Fairplain School District.[147] The area lies on the southwest boundary of the Benton Harbor Area School District and contains some 4.1 square miles and 7,000 residents.[148] The area, however, lies half in St. Joseph Township and half in Benton Township.

The statement of purpose filed by the petitioners [149] stated that immediacy of approval was essential:

"to reverse the present trend of zoning decisions, lack of code enforcement and eroding property values, all of which are adversely affecting Fairplain. The need is *now* to save Fairplain from the type of serious deterioration that has virtually ruined other communities in this and other areas."

Among other reasons of necessity given by the petitioners were that incorporation would provide them with municipal services not presently provided by the more rural-oriented township governments, better road

---

144. *Id.* at 9.

145. II Tr. 3498.

146. State Boundary Commission (SBC) Ex. 5 at 2.

147. One major change was an expansion of the eastern boundary to take advantage of the commercial development surrounding the Fairplain Plaza shopping center. This change, alleged to be a "land grab" by the opponents of incorporation, is not at issue here. The proposed boundaries can be determined by comparing the maps submitted as P-47 and SBC Ex. 1.

148. SBC Ex. 1; PXR-167A at 3.

149. SBC Ex. 5 at 9-11.

maintenance, and local governmental control.

Fairplain's incorporation was vigorously opposed by the two townships affected and also by the City of Benton Harbor and the local branch of the NAACP. St. Joseph Township contended that the proposed city was not viable and failed to meet the criteria of the Act.[150] Benton Township contended that loss of Fairplain's SEV would irreparably harm the remaining township's bondability and ability to provide municipal services. Benton Township also claimed that incorporation would be an act of segregation as the percentage of Black residents in the remaining portion of the Township would rise from 30 or more to 50%.[151] The City of Benton Harbor expressed its concern over increasing the number of political entities in the area and its fear that the purpose of the incorporation would be to establish exclusionary zoning ordinances which would block the migration of Blacks into the area.[152] The NAACP, in addition to commenting on the alleged exclusionary intent of incorporation, also contended that incorporation could affect the Benton Harbor schools.[153]

"The boundaries chosen by the petitioners for the proposed City of Fairplain allegedly coincide with what was previously known as the Fairplain School District. Petitioners state that their proposed incorporation effort has nothing to do with any school district. Yet they have chosen old school district boundaries which were eliminated in a 1965 school consolidation action rather than relying upon the present boundaries of the unincorporated area of Fairplain.

The Boundary Commission should be aware that in 1971 substantially the same petitioners attempted to transfer the identical Fairplain School District territory into St. Joseph School District which is located on the West side of the St. Joseph River. That petition, which would have resulted in racial isolation of those remaining in the Benton Harbor Area schools, was denied by the State Board of Education. We refer the Boundary Commission to that entire Fairplain school transfer matter for further reference and understanding of many of the complex issues involved in this community.

We readily realize the differences between the substance and procedures of matters before the State Board of Education and before the State Boundary Commission. We do, however, wish to refer the Boundary Commission to the fact that after the residents of Fairplain attempted to effect a transfer of their territory out of the Benton Harbor School District, there were six subsequent territorial transfers appealed to the State Board of Education. Neither the Fairplain property transfer, nor any subsequent proposed territorial school transfer involving the Benton Harbor Area schools, has been granted by the State Board of Education.

If the Boundary Commission approves petitioners' request in this incorporation matter, it should prepare itself for additional divisive actions by others in the future similar to those petitions received by the State Board of Education in reference to territorial transfers for the Benton Harbor Area schools. In other words, the Boundary Commission will be opening 'Pandora's Box' if it grants this petition.

Finally, while petitioners superficially state that the present petition has nothing to do with any school district, the Boundary Commission should realize that some persons signing petitions for this matter have been led to believe, either by mere reference to the old Fairplain School District boundaries, or by encouragement from others, that this petition represents the first step for ultimate separation from the Benton Harbor Area schools."

150. SBC Ex. 3 at 58–82.

151. PXR-172; SBC Ex. 3 at 4 19.

152. PXR 162; –163, –171; SBC Ex. 4 at 49–59.

153. PXR ·164· B; SBC Ex. 4 at 59–62.

The merits of Fairplain's incorporation as a city are, of course, of no concern to this court in this litigation. What is of concern is whether or not the incorporation of Fairplain would have the discriminatory purpose and effect of separating off a predominantly White area from the BHASD or of resulting in exclusionary zoning to the extent that segregative patterns in the BHASD are continued and maintained. After careful examination of all evidence submitted by the plaintiffs and by the SBC in its defense, I have concluded that plaintiffs have failed to show a cause of action against the SBC.

There were, in fact, some supporters of the Fairplain incorporation petition who saw it as a means for breaking off the former Fairplain School District from the BHASD.[154] However, whenever this issue surfaced at the public hearings, the idea was immediately rejected. The SBC chairman responded that "the Boundary Commission has nothing to do with the school districts or school boundaries."[155] One supporter of incorporation stated:[156]

"[T]his business about racism and separate school districts is much bolgna, they want to control their own destiny because there are [commercial] encroachments in our area on the residential area and I think that's the primary movement of much of what is going on."

The leaders of the petitioning group also rejected an assertion that incorporation could lead to a separate school district.[157] The comments of the citizens addressing the public hearing primarily went to the problems of commercial zoning and lack of township services, rather than the racial fears expressed during the course of the property transfer proceedings.[158]

The Fairplain incorporation petition in fact covered about twice the area of the Fairplain property transfer petition that had earlier been denied by the State Board of Education.[159] Census figures for 1970 indicated that the Fairplain incorporation would increase Benton Township's percentage of Black residents from 25.5% to 29.7%, rather than the increase from 30% to 50 or 55% Black projected by the Township.[160]

The SBC extensively considered the racial implications of the incorporation at their adjudicative hearing on March 14, 1976. Commissioner Rozian reminded his fellow commissioners that "constitutional provisions" must be considered in addition to the criteria of the Act.[161] The SBC was concerned that incorporation would dilute the voting power of Blacks (some 6 to 7%) already residing in Fairplain, but were convinced that Black mobility into the area was increasing and would not be affected by incorporation. The Commission also concluded that it was extremely unlikely that the State Board of Education would approve a new school district co-terminus with the City of Fairplain.[162] The SBC then proceeded to approve the incorporation petition.[163] A state court injunction has forbidden entry of the SBC's final order.[164]

Plaintiffs have failed to show that the natural, probable, and foreseeable ef-

154. One speaker at the public hearing inquired about rumors of "get[ting] our school system back." SBC Ex. 4 at 80. An editorial in a local newspaper stated that "somebody must be thinking or hoping that incorporation could also pull the old Fairplain school district away from the Benton Harbor system." PXR–170.

155. SBC Ex. 4 at 82.

156. *Id.* at 84. This was in agreement with St. Joseph Township's assessment of the prime motivation of the petitioners. SBC Ex. 2 at 82.

157. SBC Ex. 3 at 49; SBC Ex. 4 at 99.

158. SBC Ex. 5 at 196 -201.

159. The petition denied by the SBE covered only the St. Joseph Township portion of Fairplain. Testimony of State Boundary Commissioner Rozian, II Tr. 913–14.

160. SBC Ex. 5 at 165.

161. SBC Ex. 2 at 73.

162. *Id.* at 120–26. Rozian, II Tr. 800. The area is now approximately 25% Black. Nettleton, II Tr. 2350-51.

163. SBC Ex. 2 at 132.

164. Testimony of Commissioner Weidler, II Tr. 2420 21; Rozian, II Tr. 898–99.

fect of action by the SBC approving the petition for the incorporation of the City of Fairplain would be the continuation or increase of segregation in the Benton Harbor public schools. In fact, they have shown no effect whatsoever that incorporation would have upon the BHASD. Assuming that plaintiffs had, in fact, made a prima facie case that the approval was with discriminatory purpose or intent, the records of the SBC proceedings would rebut that presumption.

The SBC has no power or control over school boundaries. Testimony in the record of this case indicates that, in this day of consolidated school districts, instances where the boundaries of a school district are co-terminus with municipal boundaries are extremely rare. Any approval for a separate Fairplain School District must come from the State Board of Education. By today's opinion, this court has found the SBE liable for the segregation existing in the Benton Harbor public schools. The court will retain jurisdiction over the SBE and order that any changes in the boundaries of the BHASD be first submitted to this court for approval, until the process of dismantling the dual school system now present in the district has been completed. For this further reason, the court determines that it is unnecessary to enjoin any actions of the Boundary Commission in this matter. The court intimates, however, no opinion as to the merits of Fairplain incorporation.

### III. Liability of the Berrien County Intermediate School District.

Plaintiffs' claims against the Berrien County Intermediate School Board (BCISD) fall into three areas: (1) that the BCISD failed to exercise its supervisory powers over the Benton Harbor district and con-tributed to de jure segregation there; (2) that the BCISD contributed to segregation in Benton Harbor by approving the Sodus II transfer petition; and (3) that the BCISD permitted the formation of career education consortia among the schools of Berrien County which excluded Benton Harbor from membership, thereby contributing to the segregation of Benton Harbor's majority Black student body. At the close of plaintiffs' case, I dismissed the count against BCISD dealing with career and vocational education pursuant to Fed.R.Civ.P. 41(b). The discussion of the dismissal of that count will follow a discussion of the other claims against the BCISD raised by plaintiffs.

### A. Failure to Exercise Supervisory Powers.

The intermediate school districts are the successors to the former county boards of education under the 1962 amendments to the Michigan School Code of 1955.[165] The intermediate district, sometimes known as an "umbrella district,"[166] serves a variety of functions on behalf of its constituent, or local, school districts. The intermediate district board is composed of five members selected either by the votes of the constituent districts or by popular election.[167] In addition to powers and duties relating to the transfer of property between constituent districts, which will be discussed below, the intermediate district's services may range from providing educational media centers[168] to providing special education programs.[169]

The powers and duties of the intermediate board are partially set out at M.C.L.A. § 340.298a. Among other duties, the board is required to hire a superintendent, prepare a budget, prepare a map of the constituent

**165.** M.C.L.A. § 340.291a *et seq.* As above, citations given are to the School Code of 1955, which remained in effect throughout most of the events here complained of. These sections have been recodified, with slight modifications, in the School Code of 1976. M.C.L.A. § 380.-601 *et seq.*

**166.** Hain, Techniques of Governmental Reorganization to Achieve School Desegregation, 21 Wayne L.Rev. 779, 785 (1975).

**167.** M.C.L.A. §§ 340.293a, 340.294a, 340.-294b–.294h.

**168.** M.C.L.A. § 340.291d.

**169.** M.C.L.A. §§ 340.307a–.324a.

districts' boundaries, administer an annual school census, and employ teachers for special education programs. The board is also to "[f]urnish services on a consultant or supervisory basis to a constituent school district upon request of that district."[170] In its defense to this claim, the BCISD relies most heavily upon M.C.L.A. § 340.-298a(1)(a), which provides that the board shall:

"Perform the duties required by law and by the superintendent of public instruction, but shall not supersede nor replace the board of education of a constituent school district, nor shall it control or otherwise interfere with the rights of constituent districts except as provided in this chapter."

Also of note is M.C.L.A. § 340.301a(a), which requires the intermediate district superintendent to "[p]ut into practice *the educational policies of the state* and of the board." (Emphasis added.) The superintendent is mandated to affirmatively act in discriminatory school student problems. *Supra*, pp. 633–634. The question for this court, then, is whether, in light of the BCISD's constitutional, statutory powers, policy declarations, state constitutional mandates, and other responsibilities, the BCISD and its Superintendent took actions or intentionally failed to act, the natural, probable, and foreseeable consequences of which were to cause educational segregation in the Benton Harbor public schools.

As was discussed in the Phase I opinion,[171] a "Blue Ribbon Committee (BRC)" was formed to attempt to resolve problems within the Benton Harbor system after racial disturbances closed Benton Harbor High School in January of 1971. The formation of the BRC was also in response to the increasing number of petitions for transfer of property out of the BHASD filed at about this same time. The BRC was composed of representatives of each school area

within the BHASD, along with representatives from the BHASD and BCISD boards and administrative staff, and from the neighboring school districts of St. Joseph, Eau Claire, and Coloma.[172]

The evolution of the BRC and whether or not the BCISD was the moving force behind its formation was hotly contested at trial. The chronology of events appears to be as follows: On January 5, 1971, before the disturbance at the high school, the minutes of the BCISD Board meeting indicate that the BCISD Board had received a request from the BHASD Board for an informal meeting "for the purpose of discussing the plight of the Benton Harbor School District."[173] The BCISD minutes for January 27, 1971 reflect the following discussion:[174]

"The Board discussed the situation of the Benton Harbor School District relative to transfers and organization of the district, and felt that more study should be given to the problems of the district and that the study should be done as soon as possible in order to give proper consideration to transfer of properties as well as the other problems of the district. They also felt that the State Board of Education should become more involved with the current problems."

On March 19, 1971, the BCISD passed a resolution authorizing the creation of a Blue Ribbon Committee:[175]

"WHEREAS the Intermediate School District Board recognizes the legitimate concerns of the Benton Harbor parents regarding the current jeopardy of their children's educational opportunities; THEREFORE, BE IT RESOLVED, that a Blue Ribbon Committee be established immediately to study the pressing problems of the Benton Harbor Area School District and that consideration be given to all possibilities for the permanent and orderly solution of the existing problems

---

**170.** M.C.L.A. § 340.298a(1)(g).

**171.** 442 F.Supp. at 1331-33.

**172.** I -58.

**173.** I-54A.

**174.** I-54B.

**175.** I 34 at 9.

including the structural reorganization of the district and other alternatives."

The BHASD Board endorsed this resolution on March 29, 1971.[176] The BHASD endorsement urged review of what it considered to be Benton Harbor's three major problems: safety of students, development of each student to the maximum of his potential, and the breaking down of cultural differences. The Benton Harbor Board also suggested the following actions be considered: [177]

"Among the possible actions for improving education both in the Benton Harbor Area and throughout the county are:

1. Revamping district boundaries in a manner consistent with the requirements of State and Federal laws.

2. Expansion of programs for the educationally disadvantaged on a county-wide basis.

3. Development of guidelines for challenging academically talented and creative students all through their school experience, hopefully within the comprehensive school.

4. Development of a program of vocational education on a county-wide basis which would offer programs in a wide spectrum of vocational skills including both service and manufacturing occupations."

Defendant BCISD contends that the Blue Ribbon Committee was formed in response to the request of the BHASD.[178] The plaintiffs contend that the BRC was entirely the creation of the BCISD.[179] The court concludes from the record before it that the Blue Ribbon Committee was formed as a result of the cooperative efforts of both the BHASD and the BCISD boards. However, I feel it is of little significance which party provided the impetus for the formation of the BRC. What is of the greater significance to this litigation is whether, once the BRC was formed, the Berrien County Intermediate Board properly exercised its powers and responsibilities in relation to the activities of the BRC.

The BRC meetings, although not open to the general public were open to the news media.[180] From the beginning, the BCISD managed the administrative details of the Committee.[181]

At the first meeting of the BRC, discussion centered mainly on the racial and socioeconomic problems that were the source of Benton Harbor's troubles and on the means by which BHASD boundaries could be revamped to solve those problems.[182] The representative present from the State Board warned the Committee that the SBE would not favor any district reorganization plan which would militate against desegregation and that the SBE would look adversely upon property transfers causing an increase in racial segregation.[183] The second meeting of the Committee focused on violence and problems in educational achievement at Benton Harbor High School.[184] Subsequent meetings considered proposals submitted by Committee members and private citizens.[185]

The BRC saw the major questions before it as: [186]

"1. Stability of the entire Twin Cities Area.

2. Safety of children in the school and community.

---

176. PXR–285 at 3.

177. *Id.* at 4.

178. *See* Statement of BHASD Superintendent Lewis at SBE hearing. SBE Ex. 2–b at 21.

179. *Testimony of Lester Page,* BHASD Board member, 1965–71, II Tr. 969–70, 1071–73; testimony of Dr. Harzel Taylor, BHASD Board member, 1965–70, II Tr. 1475. *But see* Dr. Taylor's contrary testimony that the BHASD requested the BRC be set up, II Tr. 1060–07.

180. I–64.

181. *See* Minutes of Steering Committee Meeting, I–66. *See also,* I–67 at 1; Taylor testimony, II Tr. 1465.

182. I–67.

183. *Id.* at 2–3.

184. I–68.

185. I–69 through I–85.

186. Final Report of the BRC. PXR–286 at 7.

3. Quality of education in the Benton Harbor School District.

4. Protection of property values.

5. How will the district be changed to solve the above questions?"

Although the Committee passed a resolution recommending the BCISD and the "community-at-large . . . move with haste and sincerity to peaceful and total integration," it also rejected a resolution:[187]

"[t]hat the District and the total Twin Cities Community must intensify their efforts to eliminate de facto segregation in schools of the Benton Harbor Area School District and in adjacent communities."

The Committee adopted a number of recommendations dealing with administrative and community changes. Among these were proposals to deal with "educationally handicapped" children, to establish a disciplinary policy committee, for increased counselling, and for renewed millage efforts.[188]

The BRC, however, concluded that any changes could be successful only if Benton Harbor was redistricted.[189] The tone of these proposals is somewhat ambiguous, so they will be set out at length:[190]

"A. Because of the exodus from the community, this Blue Ribbon Committee should come up with some form of redistricting to address the present problems of the Benton Harbor Area School District.

B. In order to evaluate alternative proposals and develop an orderly plan

for redistricting, the Berrien County Intermediate School Board should immediately initiate the following activities:

(1) Survey known or identified petitioning groups to clarify their direction or preference for redistricting or other solutions.

(2) Appoint a permanent Committee to make a final recommendation for a redistricting plan to the Berrien County Intermediate School Board.

(3) Appoint a resource team to assist the permanent Committee in examining alternative proposals in detail and preparing the final recommendation for redistricting.

(4) Establish a 60-day time limit from the date of the first meeting of the permanent Committee to complete this assignment."

Of the seven alternative proposals for redistricting before the BRC (only one of which received a majority vote and none of which was endorsed in the Committee's final report),[191] only two would have resulted in a less segregated district.[192] Both of these less-segregative alternatives were ignored, however, when the Steering Committee of the BRC agreed on three proposals for redistricting to be studied for feasibility:[193]

"(1) City of Benton Harbor to remain the Benton Harbor school district with other areas of the existing district assigned to contiguous districts.

187. Minority Report of the BRC. PXR–284 at 5.

188. PXR–286 at 24–25.

189. The Chairman of the BRC called this the "priority recommendation" in his letter to the President of the BCISD Board, in which he transmitted the Report of the BRC. I–65.

190. PXR–286 at 23.

191. I–71 at 5–6.

192. PXR–286 at 28–29. The "Nettleton" proposal called for a new "North Berrien County District" which would be created by the consolidation of the Lakeshore, St. Joseph, Benton Harbor, Coloma, Eau Claire, and Watervliet

school districts. PXR–284 at 8; I–71 at 5. The Fellner proposal called for dissolution of the Benton Harbor District and transfer of its various areas to contiguous districts, none of which would have been more than 24% Black. I–73. The other proposals called for such solutions as redistricting by governmental units (leaving an almost all-Black City of Benton Harbor district), dividing the present district into smaller districts, and permitting the requested property transfers.

193. I–65 at 2. The BCISD was advised of the segregative implications of these redistricting plans by Lester Page, the former President of the BHASD Board. PXR–290.

(2) Petitioners seeking property transfers provide the basis for realignment.

(3) An area larger than the City of Benton Harbor remain the Benton Harbor School District with areas larger than those seeking property transfers to be the basis of the plan. . . ."

Implementation of any one of these proposals would have resulted in the abandonment of a predominantly Black and poor district in the inner-city areas of the BHASD to cope with the tremendous problems of the area, while permitting predominantly White and wealthier areas of the district to join contiguous, predominantly White school districts.

The recommendation of the BRC was followed and a Redistricting Planning Committee (RPC) was formed. Its members were appointed by the President of the BCISD Board.[194] Dr. Ray E. Kehoe, Associate Director of the University of Michigan Bureau of School Services, was retained by the BCISD as a technical consultant for the RPC.[195] The RPC was also given the BCISD's guidelines on property transfers, among which was the consideration of how any transfer would affect the "racial pattern" of the sending and receiving districts.[196] The RPC was entirely a creature of the Berrien Intermediate Board.

Meetings of the RPC extended over several months, from July 22, 1971, until February 22, 1972.[197] At its initial meeting, the President of the BCISD Board gave, as part of his charge to the Committee, the direction:[198]

"To try to apply the Intermediate School District Board's guidelines so that an equitable opportunity may be given to the entire area to vote on such a request that will be:

(1) *Satisfactory to those who wish to leave the district* and will not result in great hardship on either:

(2) the sending district, or

(3) the receiving district." (Emphasis added.)

As with the BRC, the RPC meetings were closed to the public, but members of the news media were welcome.[199]

The RPC received petitions at its meetings from nearly every formerly independent district within the BHASD. All requested detachment from Benton Harbor.[200] The Committee was warned by a representative of the Michigan Civil Rights Commission of the concern of the Commission that division of the district might work against integration.[201] The RPC was also cautioned by its consultant that, after considering the alternatives, the Committee "may find there is no place to move."[202]

The plans submitted to the RPC were narrowed by the Committee to twelve suggested redistricting plans.[203] In considering these plans, the RPC's minutes reflect the following discussion:[204]

"Oliver Rector stated that [h]e felt that any plan suggested that would include the surrounding school districts would not receive much approval from them, in fact, they would probably fight any action of that nature.

Henry Gleiss indicated he thought that the Committee should play down the financial difference because of the newly proposed financing plan, and that since they could not maintain a racial balance as indicated by the current trend, that the Committee may need to play down the racial balance aspect. He stated that

194. I–85, –86.

195. I–89.

196. I–87.

197. I–95 through I–106.

198. I–95 at 1.

199. *Id.* at 3.

200. I–97, –98.

201. I–97 at 2.

202. I–98 at 1.

203. I–108(A)–(J).

204. I–103 at 1.

we should strive for a quality program with good educational goals and attitudes and look for the areas of similar interest in considering a plan.

Howard Edwards stated that in effect, the racial balance may be looked upon with disfavor, and if we would have any plan that would appear to intensify the segregation problem, would not be approved and we would be headed for many legal tests. He stated that none of the 12 plans so far presented that he could see would be a good plan."

Mr. Edward's concerns that implementation of any of the proposed plans would intensify the segregation of the Benton Harbor district were confirmed by a Michigan Civil Rights Commission study.[205]

Eleven of the twelve plans proposed transferring portions of the existing district to adjacent districts or the division of the existing district into new districts. Plan 12 was the "Nettleton" plan for a North Berrien County district. Only the Nettleton plan would not have resulted in substantially increased segregation. For instance, plans 1 through 3 called for allowing petitioning areas of the district to transfer out, leaving a remaining district more than 70% Black.[206] Plan 4 called for the creation of three new districts out of the BHASD, with a "Central" district that was 86% Black having an average SEV of $11,250 per student. Plan 4's "North" district would be 92% White with $19,000 average SEV and its "South" district would be 90% White with an average $29,000 SEV.[207] Plans 5 through 11 would result in inter-city districts varying from 71% to 86% Black and outlying districts from 81% to 93% White.[208] It is doubtful any one of these eleven plans could pass constitutional muster.

Voting on these twelve plans at the RPC's December 7, 1971 meeting proved inconclusive—no plan received more than four of the seven possible votes.[209] The Committee did conclude, however, that because of the opposition of neighboring districts to attachments from the Benton Harbor district, any redistricting plan would have to be accomplished within the boundaries of the BHASD.[210] By its subsequent meeting, the RPC had a thirteenth plan before it—submitted by Dr. Kehoe and calling for decentralization of the district.[211] The plans receiving the most support were plans 4, 8, 12 (Nettleton), and 13 (Kehoe).[212] The final report of the Committee specified these four plans, stated the Committee's inability to support any particular plan, and concluded that:[213]

> "The Committee is further agreed that the public use the means available under existing provisions of the statutes to pursue remedies to their problems and grievances, in the knowledge that this Committee is an advisory body and holds no authority in the present matter."

The RPC then transmitted its report and supporting documents to the BCISD.

At its next meeting, on March 15, 1972, the BCISD Board received the report of the RPC. The following entry appears in the minutes:[214]

> "The Board discussed at great length the report and reviewed the plans presented which the Redistricting Committee had studied. The Board noted that no plan was recommended by the Redistricting Committee.
>
> The Board felt that they should not attempt to impose any plan upon the Ben-

---

**205.** PXR–288. The report indicates the SBE received a copy of the proposed plans from "the U of M," presumably from Dr. Kehoe, the RPC's consultant.

**206.** *Id.* at 3.

**207.** *Id.*

**208.** *Id.* at 3–5.

**209.** I–104.

**210.** *Id.* at 2.

**211.** This "Federated District Plan" appears as an appendix to PXR–287. This plan would have required state enabling legislation.

**212.** I–106.

**213.** *Id.* at 3.

**214.** I–40.

ton Harbor school area, and further, expressed that any plan for redistricting should come from the people of that area. *If a plan should be presented which would involve all the students of the Benton Harbor area, the Board would be willing to consider such a plan.*

The following preamble and resolution were offered by member Donald Stover and supported by member Adrian Van-Ginhoven:

WHEREAS:

1. The Board of Education of the Berrien County Intermediate School District received and accepted the report of the Benton Harbor Area Redistricting Committee relative to the various plans studied by the Committee; and

2. this board of education reviewed the report and the several plans which the Committee considered as possible methods for redistricting the Benton Harbor Area School District;

THEREFORE BE IT RESOLVED, That the Board of Education of the Berrien County Intermediate School District forward the report and all supporting documents without recommendation pertaining to the plans, to the Benton Harbor Area School Board and further make available, in the office of the Intermediate School District, the report and documents to any interested groups in the Benton Harbor service area.

Ayes: Members Adrian VanGinhoven Aye
Donald Stover Aye
Benjamin Nye Aye
Lawrence Peachey Aye

Nays: Members None
Absent: Member Ralph Lehman

Motion declared adopted." (Emphasis added.)

Within weeks after 'this discussion, the BCISD denied both the Eaman/North Shore and Millburg petitions for transfer to Coloma.[215] In both actions, one of the reasons given for denial was that "the petitioning area does not lend itself to an orderly

overall redistricting plan." [216] The Intermediate Board, at this time, seemed to reject any attempt at piece-meal fragmentation of the Benton Harbor district, until the Sodus II transfer petition came before it.

■ The Berrien County Intermediate School District and its Superintendent argue that they cannot be held liable for failure to exercise their supervisory powers with regard to the Benton Harbor public schools to prevent the maintenance of the segregated conditions there. They point to M.C.L.A. § 340.298A(1)(a), which prevents intermediate boards from superseding or replacing the local boards of education and from controlling or interfering with local district rights. The BCISD also contends that, under M.C.L.A. § 340.298a(1)(g), it can only furnish supervisory services upon the express request of the constituent district. I believe that the BCISD and its Superintendent construe these statutory provisions much more strictly than the legislature intended. The provision of M.C.L.A. § 340.-298a(1)(g) *mandates* intermediate board assistance at the local district's request. Nothing in the statute, nor in any Michigan court opinion construing the statute, prohibits the intermediate district from offering use of its supervisory or consultant services to the local districts, particularly where, as here, the intermediate district is in possession of a wealth of information indicating the segregated condition of the local district and the fact that the local district is beset with the problems of the larger community—problems which the local district is no longer able to manage alone. The BCISD and its Superintendent failed to exercise their constitutional and statutory responsibilities to remedy the de jure segregation existing in Benton Harbor public schools.

The BCISD made a deliberate decision not to take action to alleviate the segregation existing in the Benton Harbor schools. As I have stated previously:

In light of the clear notice and requirement of *Brown I* [347 U.S. 483, 74 S.Ct.

---

**215.** PXR–258.

**216.** I–41 at 8; I–42 at 1.

686, 98 L.Ed. 873], where opportunities for positive action are presented, where the consequences of failure to act are clearly foreseeable, and where those consequences are significant contributions to the creation or maintenance of segregated schools, the failure to act is deliberate and intentional. Moreover, if the fabric of the law is to be preserved, if substance is to have meaning beyond form, if the promise of the Fourteenth Amendment is to be fulfilled, then the deliberate failure to act by either state or local authorities must itself be actionable in this court. Plainly, where public issues are framed and questions posed which bear directly on the quality of education, a deliberate negative response from school authorities or a deliberate omission to act, can affect the shape of subsequent circumstances just as materially as can affirmative decisions and action. State responsibility under the United States Constitution must logically be and is fixed in either context. *Oliver v. Kalamazoo Board of Education*, 368 F.Supp. 143, 178 (W.D.Mich.1973).

The only occasion on which the Intermediate Board exercised its supervisory or consultant services with regard to the Benton Harbor district involved the Blue Ribbon and the Redistricting Planning committees. The BCISD again argues that no liability can result from the activities of these committees, because they performed purely in an advisory function and no recommendations for redistricting were ever enacted. The Intermediate Board again understates its influence and responsibilities.

During this period, the BHASD was suffering tremendous instability. The district was losing several hundred White students per year. The percentage of Black students was increasing 3 to 5% per year. Property transfer petitions for nearly one-quarter of the district remained pending before either the Intermediate Board or the SBE. Although the Intermediate Board denied all but one of these petitions, the BCISD's

constitutional responsibility to Benton Harbor demanded that it do much more. The activities of the BRC and the RPC once again gave hope that the proper way to solve the many problems of the district was to isolate those problems within the largely poor, largely Black central city. The BCISD had an affirmative duty to put an end to these hopes for separate and unequal school districts, particularly where committees under the control of the Intermediate District were involved with propagating these ideas. To the contrary, the activities of these committees, under the control of the BCISD, gave an aura of respectability to many redistricting plans which were unabashedly racist.

The BCISD took no action calculated to disavow any such plans and instead incorporated two of those plans in the Final Report of the RPC, which report was widely circulated about the community. The natural, probable, foreseeable, and actual result of the BCISD's and its Superintendent's actions and inactions with regard to the Blue Ribbon and Redistricting Planning committees was the continuance and increase of segregated conditions suffered by the school children of the Benton Harbor public schools. The BCISD and its Superintendent failed to rebut the presumption, thus made, that these actions and inactions were undertaken with discriminatory purpose and intent.

*B. Approval of the Sodus II Transfer.*

The petition for the transfer of the Sodus II area was presented to the BCISD on March 5, 1973.[217] The details surrounding the transfer may be found in the discussion of the transfer as it relates to the liability of the SBE and the Eau Claire School District.[218] At its hearing on the transfer on April 24, 1973, the petitioners spoke primarily of their fears of attending Benton Harbor schools and their desire to attend school in a smaller, more rural environment.[219] Those opposed to the transfer repeatedly

217. PXR–258.

218. *Supra* Part I(B)(2); *infra* Part V.

219. *Supra* Part I(B)(2) at 654.

warned of the detrimental effect the transfer would have on integration in the Benton Harbor schools.[220] No sound educational purpose existed for the transfer.[221] The only reason given in support of the transfer was the fact that both Benton Harbor and Eau Claire "approved" of the transfer.[222]

The natural, probable, and foreseeable result of the BCISD's action in approving the Sodus II transfer would be to increase and perpetuate segregation in the Benton Harbor Area School District. Defendant BCISD has failed to show that the approval of the Sodus II transfer was the result of a consistent and resolute application of racially neutral policies. The court concludes that the purpose and intent of the BCISD's approval of the Sodus II transfer was to allow White residents of the Sodus II area to escape from a majority-Black school district the White residents no longer felt comfortable attending. The approval, therefore, must be deemed to have been undertaken with segregative intent.

The BCISD offers two defenses with regard to the Sodus II transfer approval. As did the SBE, the BCISD argues that, because the transfer was never effectuated (due to this court's injunction), there can be no segregative effect. The court rejects this argument for the same reasons it rejected the same argument when offered by the SBE.[223] Second, the Intermediate District contends that, once an appeal from its decision is filed with the SBE, its decision no longer has any force or effect, all responsibility lies with the SBE, and no liability can be found on its part. The court also rejects this argument.

The relevant portion of the property transfer statute provides that:[224]

"Such appeal [to the SBE] shall have the effect of holding the effectiveness of the resolution from which appealed in abeyance until the appeal is acted upon by the state board of education."

This language has been construed by the Michigan Supreme Court, in *Rutter v. Board of Ed. of Handy No. 1 Fractional School Dist.*, 359 Mich. 461, 102 N.W.2d 192, 195 (1960), as meaning only that "the transfer shall not become effective until that time." The action is not voided by an appeal, for the intermediate board may validly take actions relevant to the transfer—such as holding elections to approve the transfer—while the appeal remains pending.[225]

■ Nor, as a practical matter, is the decision of the intermediate district ignored by the SBE in making its decision. The minutes of the intermediate board's hearing and its decision become part of the record before the SBE. Dr. Porter testified that the SBE takes into consideration the intermediate board's actions.[226] State Board Member Kelly testified that she relies in part upon the intermediate board in making her decision.[227] Finally, in voting to approve the Sodus II transfer, the SBE resolution relied in part upon the fact that the BCISD approved the transfer.[228] The BCISD cannot escape all responsibility for

---

220. *Id.* at 653.

221. *Id.* at 652–654.

222. I–45 at 2–3.

223. *Supra*, Part I(B)(2) at 657. Plaintiffs' expert witness in rebuttal refuted the contention that the Intermediate Board's action could have no effect:

". . . [I]t would indicate readily to those who are concerned about the integration of (sic.) the desegregation of school districts, that the Intermediate School District has shifted its opinion . . .. [T]he one granting or granting of that request sends a clear-cut message to school districts throughout the state that an Intermediate School Board . . . no longer felt that it was necessary or appropriate to maintain factors in such a way that they do not lead to a segregated school system."

Green, II Tr. 4436–37. That impact would be more significant than that of the prior six transfer petition denials. *Id.* at 4508.

224. M.C.L.A. § 340.467. The language in the School Code of 1976 now reads:

"The pendency of an appeal shall suspend the action or determination of the intermediate school board . . ." M.C.L.A. § 380.971.

225. *Id.* at 464, 102 N.W.2d at 195.

226. II Tr. 768–69.

227. II Tr. 1087.

228. SBE Ex. 7–a(b) at 2.

the consequences of its invalid decision merely because that decision was appealed to a higher body. Nor could the BCISD, at the time it acted, be certain there would be an appeal which would delay the effectiveness of its action. In light of the BHASD Board's lack of opposition to the transfer, only an appeal from residents of the area to be transferred could be taken. For instance, had all Sodus II area residents agreed with the transfer, or been intimidated by public opinion from opposing the transfer, no appeal would have occurred and the BCISD's action would have been final.

The Intermediate Board's approval was another blow to the unity of the Benton Harbor district and renewed the hopes of those parties who sought its dissolution. The approval once again launched the district into a period of instability and uncertainty which could not be overcome while the segregative property transfer petition remained pending before the State Board of Education.

### C. Career and Vocational Education Consortia.

Plaintiffs' final claim against the BCISD is that the BCISD permitted the formation of career education consortia among the school districts of Berrien County which excluded the Benton Harbor district from membership, thereby contributing to the segregation of Benton Harbor's majority-Black student body. Plaintiffs allege, particularly, that three Career Education consortia were formed in Berrien County which included every Berrien school district with the exception of Benton Harbor.

Plaintiffs are, however, mistaken as to the nature of career education in Berrien County and have confused programs for career education with separate programs for vocational education. Raymond Sreboth testified that no Career Education consortia exist in Berrien County. There are, however, vocational education consortia in Berrien County to which Benton Harbor does not belong.[229]

Vocational education programs were begun under the authority of Michigan statutes enacted as early as 1919 in order to implement federal programs under the Smith-Hughes Act.[230] Intermediate districts are generally not involved with the vocational education programs of the local districts.[231] Where a majority of the voters in an intermediate district approve, however, the intermediate board may establish an area vocational-technical program and impose a millage for such program.[232] A proposal to establish a vocational-technical program in Berrien County was defeated by the voters in 1969.[233] There is no evidence the rejection had racial motivations. Black areas of Benton Harbor as well as White areas rejected the proposal[234] and the rejection can more likely be attributed to "taxpayer revolt."

Career education programs are of more recent vintage than vocational education programs. The Career Education Act, M.C.L.A. §§ 388.1311 et seq., was adopted in 1974 and covers a far broader range of activity than the traditional areas of vocational education:[235]

"Career education means programs for K–12 students designed to create career awareness, orientation, exploration, planning, preparation, and placement, to maximize career options available, and to provide comprehensive career development. In addition, career education shall provide for the full development of students to gain maximum self-development and fulfillment from career preparation and choice, and to maximize the capabilities

---

**229.** II Tr. 1897, 1922.

**230.** M.C.L.A. § 395.1 et seq.; Sreboth, II Tr. 1888.

**231.** Sreboth, II Tr. 1922.

**232.** M.C.L.A. §§ 340.330–.330u.

**233.** Sreboth, II Tr. 1926–29.

**234.** PXR–307 at 3.

**235.** M.C.L.A. § 388.1312(a). Sreboth, II Tr. 1886–87.

of students to explore, analyze, prepare for, gain entry to, and succeed in career choices."

Intermediate districts and local districts, in geographic proximity to each other, may form career education planning districts.[236] As noted above, no such planning districts exist among the local districts of Berrien County. Local districts prepare annual career education plans and submit them to the BCISD Career Planning Coordinator.[237] The Intermediate Board, however, cannot approve or disapprove these local district plans.[238]

According to Mr. Sreboth, Benton Harbor refused to join in a vocational educational consortium with any neighboring district because "[w]e were large enough, qualified for our own director and had our own very excellent facilities."[239] Nor would Benton Harbor have gained additional staff or facilities by joining a consortium. Benton Harbor's facilities were open to students from other districts on a space available basis.[240]

This court finds Superintendent Sreboth's testimony credible and concludes that the decision not to join a vocational education consortium was originated by the BHASD and was not motivated in any way by the desire of the predominantly White neighboring districts to exclude Benton Harbor from those consortia with discriminatory intent. The record before this court shows that Benton Harbor had a fine vocational program, one for which it was justifiably proud and protective. Its decision not to join a consortium, a decision over which the Intermediate Board had no control, had no racial motivation. It is for these reasons that plaintiff's claim in this area against the BCISD has been dismissed.

### IV. The Liability of the Coloma Community School District.

Plaintiffs must show that the Coloma School District (Coloma) took actions or intentionally failed to take actions with regard to the Eaman transfer having the natural, probable, and foreseeable result of actually increasing or perpetuating segregation in the Benton Harbor and/or Coloma public schools. To rebut a presumption of segregative intent that would result from such a showing, Coloma would have to affirmatively establish that its actions or inactions were a consistent and resolute application of racially neutral policies. *Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 182. Specifically, to invoke the remedial powers of this court, plaintiffs must show racially discriminatory acts of Coloma have been a substantial cause of interdistrict segregation. *Milliken v. Bradley,* 418 U.S. 717, 745, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

Coloma's defense during these proceedings has been that it was opposed to the Eaman transfer. The statistical facts regarding the transfer, the motives of the petitioners, and the actions of the SBE relative to the transfer have been previously discussed.[241] The court will now focus upon the actions and inactions of the Coloma Board relative to the Eaman transfer.

The Coloma Community School District was formed in 1958 from the consolidation of the Coloma City, Boyer, Bundy, Clymer, Ingrahan, and Washington school districts. At that time Coloma had 1,360 students. Shortly thereafter the Gray and Curtis districts were annexed to Coloma, adding an additional 91 children. In the years 1965–67, the Stanley (61 children), the Bainbridge (67 children), and the Pier (189 children) districts were either annexed or attached to Coloma.[242] The annexation of the Pier District was particularly significant and will be discussed in further detail *infra*.

---

**236.** M.C.L.A. § 388.1312(b).

**237.** M.C.L.A. § 388.1317; Sreboth, II Tr. 1884.

**238.** Sreboth, II Tr. 1896–97.

**239.** *Id.* at 1889, 1893, 1925.

**240.** *Id.* at 1893–94.

**241.** *See* Part I(B)(1), *supra*.

**242.** These figures and dates are taken from Col. Ex. 9.

Property transfer petitions to Coloma preceding the Eaman petition, Coloma's position on the proposed transfers, and statistics relevant to the petitions are as follows: [243]

| Date | Petitioner | Position (Losing District) | Position Coloma | Number of Children | SEV |
|------|-----------|---------------------------|-----------------|--------------------|-----|
| 5/13/65 | Hauch, et al. | Opposed (Cribbs) | Would Accept | 4 | $54,000 |
| 5/24/65 | Spilger, et al. | Not Willing (BHASD) | Willing to Accept | 17 | 117,000 |
| 12/13/65 | Arent, et al. | Opposed (Cribbs) | Would Accept | 5 | 69,000 |
| 11/14/66 | Gallas, et al. | Not Opposed (Pier) | Willing to Accept | 8 | 14,520 |
| 11/14/66 | Merritt, et al. | Opposed (Cribbs) | Willing to Accept | 1 | 25,000 |
| 12/5/66 | Kimbrough, Kneibes | Opposed (Cribbs) | Willing to Accept | 1 | 17,000 |
| 12/5/66 | Hall, et al. | Not Represented (Pier) | No Position | 8 | 23,826 |
| 11/9/67 | Schnick, et al. | Not Present (Pier) | Not in Favor | 7 | 49,203 |
| 6/25/68 | Lull | Opposed (BHASD) | Willing to Accept | 1 | 17,390 |

The Intermediate District approved all of these transfer petitions with the exception of the Spilger and Arent petitions. Only the Merritt, Kimbrough/Kneibes, and Lull decisions were appealed to the State Board. The SBE affirmed the Merritt transfer, affirmed the Kimbrough portion of the Kimbrough/Kneibes petition, and reversed the Intermediate Board's approval of the Lull petition.[244]

The first time the subject of the Eaman transfer appears in the Coloma Board's minutes is on August 28, 1969. At that time a group of Eaman residents appeared to seek Coloma's approval of the transfer attempt. The Board then went into executive session and, upon reopening the meeting, stated that they "were not interested" in the annexation of the Eaman area.[245] The September 8, 1969 minutes indicate, however, that this decision was not final.

At this meeting the Coloma Board decided to "give the matter some thought before making a final decision." [246] This conclusion is bolstered by the testimony of Floyd Mattheeussen, a Coloma High School teacher and supporter of the Eaman transfer.[247]

"I never had the feeling that the Coloma Board had just said 'Absolutely not, no, under any circumstances,' or whatever. I got the feeling like it was floating, whatever the powers that be decide, that's what they would live with. And even my presence in the second hearing was evidence of that, 'Well, Eaman is here. We are going to follow and pursue whatever needs to be done, and we will participate.' But never did I ever get the feeling that they were saying either no, emphatically, or yes, emphatically."

As mentioned previously with regard to the liability of the State Board on the Eaman

---

**243.** Col. Ex. 9. The positions of the relevant school district boards are those communicated to the Berrien Intermediate Board and appear in I-1. Testimony of James W. Walton, Administrative Assistant to the BCISD Superintendent, II Tr. 3847–48.

**244.** *Id.*

**245.** Col. Ex. 2 at 1.

**246.** *Id.*

**247.** II Tr. 182–83.

transfer, Mr. Mattheeussen was not just any other supporter of the Eaman transfer. In addition to being a Coloma teacher, Mattheeussen was a former legislator in the Michigan House of Representatives, a former member of the House Education Committee, and was intimately acquainted with the members of the State Board of Education and the workings of the state's education bureaucracy.[248]

Mr. William Barrett, Superintendent of the Coloma public schools since 1962, testified at this trial that the Coloma Board was opposed to the Eaman transfer because of overcrowding within the Coloma schools and because Coloma residents had a history of opposing expansion of the district.[249] He rejected at trial the contentions of the Eaman petitioners that Eaman had a "right" to join Coloma once the two districts became contiguous and that Coloma needed a larger base of students in order to provide a more extensive high school curriculum.[250] While he testified as to these contentions at this trial, he never made them known to the BCISD or the SBE at the time of the Eaman transfer proceedings.

The petition to transfer portions of the Eaman area from Benton Harbor to Coloma was filed with the Berrien County Intermediate School District on August 4, 1969.[251] The BCISD notified the parties of its September 30, 1969 hearing on the transfer and invited them to appear and indicate their respective positions on the transfer petition.[252] Barrett and Coloma, however, despite this invitation to appear and despite their claimed opposition to the transfer,

failed to appear at the Intermediate Board hearing to express that position and failed also to transmit any indication to the BCISD that they were opposed to the transfer.[253] The Intermediate Board denied the petition on October 2, 1969.[254] In its order denying the transfer petition, one member of the Intermediate Board listed as among the reasons: [255]

". . . if this transfer is permitted it could set off a chain reaction whereby many other property transfer requests would be made, thus fragmenting the district."

On November 10, 1969, the Coloma Board was advised that the decision of the Intermediate Board denying the Eaman transfer had been appealed by the BHASD to the SBE.[256] Coloma again sent no representative to the SBE hearing to express opposition to the transfer,[257] despite the concern expressed at the Intermediate Board hearing that approval of the transfer could set off a chain of similar requests. Such Balkanizing of the Benton Harbor district could and, of course did, have a substantial adverse racial impact upon Benton Harbor. Mr. Barrett testified that Coloma did not send representatives to the BCISD or the SBE hearings on the Eaman transfer because they felt that, in light of the previous denials of transfer out of Benton Harbor where Benton Harbor had registered its opposition, it was a foregone conclusion that this petition would also be denied.[258]

Although Superintendent Barrett testified that he was not aware of any racial

---

**248.** See Part I(B)(1), supra.

**249.** Id. at 472. In 1970, Coloma High School, with a capacity of 750 students, had 819 students enrolled. Until the new Junior High and Middle Schools were completed in 1972, the schools were on split sessions. See PXR–141, –142; SBE Ex. 5–b at 147. Despite approval of several smaller transfer petitions by the Coloma Board, the Coloma voters resoundingly defeated, as noted above, a 1966 proposal to expand the district. Coloma had also opposed attachment of the all-White Martindale district to it in 1967. Barrett, II Tr. 3526–27. This property was instead attached to the BHASD.

**250.** Id. at 3518–19.

**251.** PXR–258.

**252.** PXR–195; Coloma Stipulation at 1.

**253.** I–30.

**254.** PXR–258.

**255.** I–30 at 2.

**256.** Col. Ex. 2 at 1; Coloma Stipulation at 1.

**257.** Barrett, II Tr. 477–88; SBE Ex. I–d.

**258.** Id. at 479, 3509, 3515, 3524.

implications motivating the transfer, he conceded that he was aware of the racial complexion of the areas involved.[259] He contended that he was vigorously opposed to the later Eaman/North Shore (Wade) petition "because this was the first time that a racial situation was really brought to our attention" and that he would have "reacted at that time" if he felt the Eaman transfer had been racially inspired.[260] Any fragmentation of the district, however, would have a substantial racial impact upon Benton Harbor.

Fifteen years after the Supreme Court's landmark decision in *Brown*, many years after the Supreme Court directed an end to de jure segregation in education "with all deliberate speed," seven years after the adoption of the strong language of Michigan's "anti-discrimination" section of the 1963 Constitution's education article, VIII, section 2, and three years after the 1966 Joint Policy Statement of the State Board of Education and the constitutionally created Civil Rights Commission, the situation which confronted Barrett and the Coloma Board called for clear-cut testimony in opposition to the Eaman transfer before the BCISD and the SBE. This is particularly true in light of the knowledge Barrett and Coloma had of the effect the proposed transfer would have upon Benton Harbor, and their sophistication in property transfer matters.

Representatives of the Coloma public school district did in fact appear at both the BCISD and the SBE hearings in opposition to the Eaman/North Shore and Millburg petitions.[261] This was in concurrence with a Coloma Board policy formalized shortly after the initial SBE approval of the Eaman transfer. That policy expressed Coloma's opposition to further expansion of its district.[262] The formal policy, however, was adopted only after the SBE had adopted its policy against property transfers which militate against the integration of a district or that move in the direction of greater segregation.[263]

This court must find, however, that, despite public pronouncements that it was "not interested" in receiving the Eaman transfer, Barrett and the Coloma Board were supportive of the transfer and were, in fact, instrumental in bringing the transfer about. The court finds that Coloma's actions and inactions with regard to the transfer were willfully ignorant and deceitful and part of a sophisticated policy to bring about the very transfer it now claims to have opposed. There are several reasons for this conclusion.

First, despite claims to the contrary, the Coloma Board did in fact have a recent history of acquiring additional property. Of the nine property transfer petitions seeking entry into Coloma previous to the Eaman transfer, Barrett and Coloma had indicated to the Intermediate Board that they were favorable to seven, had no position on one, and were opposed to only one petition.[264] Although the Coloma voters indicated, by their overwhelming vote against the proposal for reorganization with the Pier District,[265] that they were opposed to school district expansion, Barrett and the Coloma Board fully participated in arranging the annexation of Pier to Coloma.[266] The number of students involved was, in the words of Superintendent Barrett, "around 200." This substantial addition of territory was arranged at a joint meeting of the Coloma and Pier school boards. At this meeting, both boards agreed the transfer was acceptable and the annexation occurred on July 31, 1967.[267] This annexation

**259.** *Id.* at 538, 551. *See also* Coloma Stipulation at 2.

**260.** II Tr. 554.

**261.** I–41, –42; SBE Ex. 5–a at 1, 5–b at 145–61, 6–a at 1, 6–b at 45–47.

**262.** Col. Ex. 2 at 2, 4.

**263.** SBE Ex. 10.

**264.** I–1.

**265.** Col. Ex. 7 at 2; I–15 at 6.

**266.** Barrett, II Tr. 473–75.

**267.** Col. Ex. 7 at 3.

was extremely important in that it made the Eaman area contiguous with Coloma and paved the way for the subsequent transfer of Eaman, an area one former Eaman School District Board member claimed that Coloma had coveted as early as the time of the Benton Harbor consolidation in 1965.[268]

Second, Coloma had a sophisticated awareness of the procedures and politics of property transfer petitions, as indicated by the numerous transfer attempts Coloma had previously been involved with. As part of the Eaman proceedings, it is inconceivable to the court that, in a district the size of Coloma, the activities of one of its teachers who was a former State Representative of some note, in favor of the transfer, went unnoticed as the Coloma Board now claims. Although Superintendent Barrett begged the question when examined on the subject, the court finds that he in fact substituted for Mr. Mattheeussen's classes so that Mr. Mattheeussen could travel to Lansing to lobby in favor of the transfer.[269] In any case, Superintendent Barrett admits that he became aware of Mr. Mattheeussen's lobbying efforts on behalf of the Eaman residents at a time the matter remained pending before the State Board. He made no attempt, though, to correct any misapprehensions the State Board members were likely to have as to whom Mr. Mattheeussen represented—the petitioners or the Coloma Board.[270]

Third, the atmosphere then present in the Benton Harbor area and expressed at the public hearings on the transfer petition could lead no reasonable observer to any other conclusion than that the transfer was racially motivated. Benton Harbor's racial tensions were well-publicized in the local press and could not have escaped the attention of the Coloma officials.[271] Mr. Barrett's claim that only later, when the Ea-

man/North Shore and Millburg petitions were filed, was he made aware of the racial motivations involved is unsupported by the record. Although Mr. Barrett claimed at this trial that he opposed these transfer attempts for that reason, Coloma's public statements in opposition to these transfers before the BCISD and the SBE concentrated exclusively on Coloma's overcrowding and Coloma's disinterest in further enlargement of the district.[272] No mention of any racial implications was made. With regard to the Eaman transfer, Mr. Barrett and the Coloma Board proceeded upon a policy of willful ignorance about the well-publicized and loudly declared claim by Benton Harbor officials and the Benton Harbor Board that the transfer would have substantial de jure segregated consequences and an overwhelming racial impact.

Fourth, Coloma's policy of opposition to further enlargement of the district was adopted at a time that the Eaman transfer could have been reversed merely by Coloma's refusal to pay for the transferred Eaman school building.[273] In this instance, Coloma's actions speak much louder than its words.

Finally, even assuming that Coloma's disinterest in the transfer was sincere at the time previous to the initial SBE action approving the transfer, it is incredible why Coloma took no subsequent actions to express this opposition during a period in which the transfer was being reconsidered. This is especially so in light of the fact that every time Coloma resisted transfers they were successful. Failure to resist the Eaman transfer tends to indicate that Coloma knew its silence would lead to approval of the transfer. Coloma's actions subsequent to the initial State Board approval of the transfer indicate that Coloma's sphinx-like silence with regard to the transfer was part of a calculated attempt to facilitate the

---

**268.** I–30 at 9.

**269.** II Tr. 523–24.

**270.** *Id.* at 525.

**271.** EC Ex. 24.

**272.** I–41, –42; SBE Ex. 5–b at 145–61, 6–b at 45–47. The overcrowding, however, was not a problem after Coloma's completion of its building plan. SBE Ex. 6–b at 46–47.

**273.** Col. Ex. 2 at 4; SBE Ex. 1 -p at 2.

transfer without taking the risk of publicly stating its support for the transfer and its efforts to bring the transfer to fruition.

Immediately after the State Board approved the transfer, the Coloma Board was contacted by Superintendent Lewis of the BHASD who requested that Coloma join him in appealing the action of the SBE and urging SBE reconsideration. The Coloma Board voted not to join Benton Harbor in such a request.[274] The Coloma Board, rather, concentrated its efforts on obtaining the Eaman School building at the lowest possible price.

From the start, Coloma had been concerned with the cost of the Eaman facility.[275] On July 13, 1970, one Board member requested that the Board "reconsider the action at the last board meeting in the acceptance" of the Eaman area. The discussion on the motion was closed pending further action by the Benton Harbor and State Boards.[276]

On July 21, 1970, the SBE voted to receive Benton Harbor's motion for reconsideration and referred the request to the Attorney General for his legal advice.[277] At its August 24, 1970 meeting, the Coloma Board's minutes indicate that SBE Superintendent Porter and Coloma Superintendent Barrett had been in contact to make arrangements for the purchase of the Eaman building by Coloma.[278]

At its August 25 meeting, the SBE, although advised by the Attorney General's office that it could reconsider the entire matter, voted to grant a rehearing only as to the value of the Eaman Building:[279]

"In a letter opinion of August 12, 1970, the Attorney General stated that due to the 'finality of determination of the State Board of Education,' and the 'unusual factual circumstances of this case,' the State Board may reconsider its decision by granting a petition for rehearing.

Dr. Porter recommended that the Board grant a petition for rehearing in the case.

Dr. Oppewall moved, seconded by Dr. Novak, that the State Board of Education grant a petition for rehearing to the parties in regard to the building involved in Property Transfer Case 1220 and, in accordance with Section 10(c) of Act 287, P.A. 1964, as amended, appoint a hearing officer for this case and direct that the hearing be conducted in Lansing as soon as legally possible.

Dr. Riethmiller inquired if the hearing would be limited only to the building in question. Dr. Porter replied that the hearing would be limited to the building in question and a transcript of the hearing will be provided for the Board members. According to the advice from the Attorney General's office, many issues pertaining to the building may raise issues concerning the transfer, but these matters are separable. Since the building in question was not in the motion adopted by the Board, the Attorney General indicated that the building was not transferred.

Ayes: Brennan, Deeb, Kelly, Novak, O'Neil, Oppewall, Reithmiller

Absent: Morton

The motion carried."

Superintendent Barrett did not attend the rehearing, but instead delegated former State Representative Mattheeussen to attend on Coloma's behalf.[280] It is curious to note that Coloma was represented at this hearing by the same attorney as the Eaman petitioners—this same attorney represented the Eaman residents at the initial hearing before the State Board.[281] At the beginning of the rehearing, the Assistant Attorney General present ruled that testimony

274. Barrett, II Tr. 528.

275. Minutes of June 29, 1970. Col. Ex. 2 at 2. Minutes of July 6, 1970. *Id.*

276. Barrett, II Tr. 513.

277. SBE Ex. 1-g.

278. Col. Ex. 2 at 3.

279. SBE Ex. 1-h.

280. Barrett, II Tr. 521-25.

281. SBE Ex. 1-d, 1-k.

would not be limited to the question of the valuation of the Eaman building, but would be received on the entire matter of the transfer.[282] Coloma's official representative, however, confined himself solely to testimony on the building's valuation and made no mention of Coloma's supposed opposition to the transfer itself.[283] Nor did Mr. Mattheeussen make any attempt at the rehearing to distinguish between his previous extensive efforts as an alleged "private citizen" in support of the Eaman transfer and his current role as official representative of Barrett and the Coloma Board that was "not interested" in the transfer. Also, as a result of the rehearing, Coloma was on notice of Benton Harbor's testimony that the transfer would have substantial adverse racial impact, could be an act of de jure segregation, and would trigger other property transfer attempts by outlying areas of the BHASD.[284] Coloma, additionally, was put on notice about Benton Harbor's involvement in this very school desegregation case.[285]

Although told by Dr. Porter that they still had the option of denying the entire transfer, the SBE on October 13, 1970, voted only to modify the order of transfer, "to include the transfer of personal property and the real property and make a determination as to an equitable payment for the property at a later date."[286] On October 16, 1970, Hearing Officer Boline recommended that the Board set a price of $40,-000.[287] On November 10, 1970, the SBE entered the following order:[288]

"Dr. Riethmiller moved, seconded by Dr. Novak, that the State Board of Education order the Coloma Board of Education to pay the sum of $40,000 to the Benton Harbor Area School District in full payment for the Eaman School Building, the 'Little Red School House Building' and all equipment contained therein or thereon the 4.26 A. school site."

When informed of this ruling, Superintendent Barrett asked the Coloma Board, "Where will the money come from? . . . Where can it come from legally?"[289]

A period of confusion then ensued over the manner of payment. The Coloma Board evidently evidenced, informally, an unwillingness or an inability to pay for the structure. The State Board itself was unsure whether its action of November 10, 1970 had been to order Coloma to pay the $40,000 or had merely given Coloma the option of paying that amount or not receiving the structure. Some felt that Coloma had been ordered to pay the amount, but Dr. Porter, on the other hand, felt Coloma had been directed to pay for the building "only if it wished" to have it.[290] The SBE, on February 10, 1971, then entered the following order.[291]

"Miss Kelly moved, seconded by Dr. Morton, that the State Board of Education condition the transfer upon Coloma paying the $40,000 to Benton Harbor between the end of Benton Harbor's regular school year and June 30, 1971. *If the $40,000 is not paid during that period, Benton Harbor would retain the property.*" (Emphasis added.)

The ambiguity of this order was soon realized and in two weeks the SBE clarified the order:[292]

"Miss Kelly moved, seconded by Mrs. Miller, that the motion adopted by the Board on February 10, 1971, indicated as number 18 in the actions of the State Board of Education of February 9–10, 1971, be reworded as follows: 'Be It Resolved, That the State Board of Education

---

282. SBE Ex. 1–k at 13.

283. *Id.* at 66–73.

284. *Id.* at 105.

285. *Id.* at 4–5.

286. SBE Ex. 1–i.

287. SBE Ex. 1–m at 2.

288. SBE Ex. 1–n.

289. Col. Ex. 2 at 3.

290. SBE Ex. 1–o.

291. *Id.* at 2.

292. SBE Ex. 1–p at 2.

amend its order dated July 2, 1970 *and not transfer the territory valued at 2½ million as described in that order if the Coloma Board of Education does not pay $40,000 in full for the Eaman School Buildings*, and their internal and external equipment to the Benton Harbor Area School District by June 30, 1971." (Emphasis added.)

Therefore, as of February 24, 1971, it was clear to Barrett and the Coloma Board of Education that the entire Eaman transfer could be overturned by their refusal to pay the $40,000 for the Eaman building. The Board, although it did not pay the money itself, instead permitted the Eaman residents to raise the amount amongst themselves. At a Coloma Board meeting on April 12, 1971, the Eaman residents presented cash and pledges amounting to $40,000—what has sometimes been referred to in these proceedings as "ransom money." The Board accepted the gift and in turn tendered the amount to Benton Harbor and the purchase of the Eaman building was eventually consummated.[293]

Another action undertaken during this period is inconsistent with Coloma's claimed policy of opposition to the transfer. After the State Board voted to rehear the Eaman matter, Coloma was advised by officials in the SBE that the Eaman area officially remained with Benton Harbor and the Eaman area students should register with Benton Harbor.[294] Coloma, however, defied this directive of the SBE and immediately began the enrollment of Eaman students.[295] Barrett's inaction when asked to appear to state Coloma's position on the transfer before the BCISD and SBE hearings and Barrett's inaction when asked by the BHASD to join in an appeal for reconsideration of the order of transfer is in marked contrast to his lightning action to enroll Eaman students into Coloma at a time the transfer was not yet final. The court finds that Coloma's haste in enrolling the Eaman students in September 1970 was directly relat-

ed to Coloma's desire to obtain a favorable vote on an upcoming bond election—a proposition that the Coloma voters had defeated several times previously.[296] It would appear that, without the Eaman vote in favor, the millage would have failed. The court finds that Coloma's actions in enrolling these Benton Harbor students was an independent act of de jure segregation with a substantial racially segregative impact. It should be remembered that, while the transfer had still not been finalized and Coloma could still have taken action to overturn the entire transfer, Benton Harbor had been found by the late Judge Kent to have a segregated teaching staff and the Eaman School at the very least would have been involved in any remedy aimed at integrating Benton Harbor's teaching staff.

Coloma has repeatedly contended that it took no action to appeal the State Board's order of transfer because they felt the action of the SBE was final and non-reviewable. For this contention they rely upon *Imlay Township Primary School District No. 5 v. State Board of Education*, 359 Mich. 478, 102 N.W.2d 720 (1960). *Imlay Township* held that property transfer decisions of the SBE "shall be final" and precluded review in state circuit courts. In 1973, the Michigan Court of Appeals ruled that a decision of the SBE granting or denying the transfer of property between school districts was reviewable in state circuit courts under the Michigan Administrative Procedures Act of 1969, M.C.L.A. § 24.201 *et seq. Irving Parents' and Landowners' Ass'n. v. State Board of Education*, 45 Mich.App. 387, 206 N.W.2d 503 (1973). *Imlay Township* itself, however, held that actions by the SBE were reviewable by writ of certiorari to the Michigan Supreme Court. This was a viable means of review, if indeed Coloma was opposed to the Eaman transfer. Nor was review under the Administrative Procedures Act of 1969 uncertain. The Act, adopted August 30, 1969,

---

**293.** Col. Ex. 2 at 5–6.

**294.** Col. Ex. 3a at 21.

**295.** *Id.* at 22.

**296.** Barrett, II Tr. 3546.

and effective July 1, 1970, was clear and certain in its terms:

"A party who has exhausted all administrative remedies available within an agency, and [who] is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, is entitled as a matter of right to judicial review thereof. Exhaustion of administrative remedies does not require the filing of a motion or application for rehearing or reconsideration unless the agency rules require [such] filing before judicial review is sought."

An aggrieved party in a transfer under the statutes has a viable opportunity to obtain review of the decision through the Administrative Procedures Act of 1969. This court concludes that Coloma, had it in fact been opposed to the Eaman transfer, could have obtained review of the State Board of Education's approval of the transfer.

This court finds it was more than just a series of coincidences that Coloma, although opposed to receiving the Eaman area, did not transmit that opposition to the Intermediate Board which had to act on it, nor the State Board when it had to act on it, and did not transmit this opposition to Benton Harbor, which was also opposed to the transfer and whom Coloma might have joined in appealing State Board approval of the transfer. It was more than a series of coincidences that Floyd Mattheeussen, an employee of the Coloma District, who happened to have been a former State Representative and who, while in the State Legislature, served on the Committee on Education, happened to appear in Lansing to talk with members of the SBE in support of the Eaman transfer, and then later was chosen to be Coloma's official representative to the SBE rehearing on the Eaman transfer. Finally, it was more than a coincidence that Coloma and the SBE, within one week of each other, happened to pass prospective policy statements opposing property transfers, and only after the Eaman transfer was an accomplished fact to them.

The actions of the Coloma Board both before and after the initial action of the State Board of Education's approval of the Eaman transfer leads this court to the conclusion that Coloma was in fact one of the motivating factors behind the approval of the transfer. De jure segregation is invidious and insidious. It has developed code words, body language and non-verbal expressions that can communicate to school officials. One State Board member stated that the board members felt that Coloma's neutrality indicated it would not object to taking students as a result of the transfer.[297] The court finds that Mr. Mattheeussen was the conduit of Dr. Oppewall of this position, but the position was also indicated by Coloma's and Barrett's non-verbal actions. In the Eaman transfer, Barrett's and his board's non-verbal, sphinx-like silence was heard loud and clear by SBE board members Oppewall, Brennan, Deeb, and Novak, who voted to approve the transfer.

The Coloma Board's actions, particularly with regard to the purchase of the Eaman building and the enrolling of the Eaman students, proximately resulted in the culmination of the Eaman transfer. Their actions, therefore, had the natural, probable, foreseeable, and actual result of substantially contributing to the segregation of the Benton Harbor public schools and substantially caused the myriad problems which devastated the BHASD as a result of this transfer.[298] Coloma has failed to show that these actions were part of a consistent and resolute application of racially neutral policies. The court can come to no other conclusion than that these actions were taken with the intent of providing, within the Coloma public schools, a refuge for White students seeking to flee the increasingly Black Benton Harbor public schools.

## V. The Liability of the Eau Claire School District.

The plaintiffs have also alleged that the Eau Claire School Board (Eau Claire)

---

297. Col. Ex. 3a at 6.

298. See Part I(B)(1) supra.

should be held liable for racially segregative actions relating to the Benton Harbor Area School District and the efforts to transfer the predominantly White school property of Sodus from the BHASD to Eau Claire. The general factual situation with regard to these transfer attempts was examined earlier with regard to the liability of the State Board of Education and the Berrien Intermediate District.[299] The particular facts which apply to the Eau Claire will next be examined.

The position of Eau Claire has been that it strongly supported, and continues to strongly support[300] the transfer of the Sodus II area to its district and that that support is without any discriminatory purpose. As has been earlier discussed, the Sodus II transfer would have the natural, probable, and foreseeable result of increasing and maintaining segregation in the Benton Harbor public schools. If the plaintiffs have shown that the actions undertaken by the Eau Claire Board in supporting the Sodus II transfer would substantially contribute to this result, the task before this court, then, would be to determine if Eau Claire has shown that its support of the transfer was a consistent and resolute application of racially neutral policies.

The Eau Claire School District was formed in 1963 by the consolidation of the Village of Eau Claire public schools with a number of small rural districts. According to one Eau Claire Board member, the district recruited the former Chadwick, Sodus and Mt. Pleasant school districts (the Sodus II area) to join Eau Claire, but these areas instead consolidated with the Benton Harbor District.[301] The Stump School District (part of the Sodus I area but not part of Sodus II) was allegedly not recruited because of its large size and closer proximity to Benton Harbor.[302] All four of these districts had historically sent their high school students to Benton Harbor in pre-consolidation days.[303] While the Mt. Pleasant, Chadwick, and Stump districts voted in favor of the 1965 consolidation, the Sodus District voted against consolidation.[304] Sodus, however, became part of the consolidated district due to the over-all favorable vote in favor of consolidation cast throughout the district. The Sodus area has generally voted against various efforts of the BHASD to raise operating funds and bond money.[305]

The Eau Claire District is presently composed of one elementary, one middle, and one high school. In the years 1970–76, the Eau Claire school enrollment ranged from a low of 1,212 students (in 1970) to a high of 1,367 students (in 1975). The percentage of Black students has decreased from 16.3% in 1970 to 8.8% in 1976, the most recent year for which enrollment statistics were presented to the court.[306]

The fact that Eau Claire became a refuge for tuition students seeking to flee the increasingly-Black Benton Harbor public schools was discussed earlier in relation to the SBE's liability.[307] That discussion is equally applicable here and this court is compelled to conclude from the record before it that the natural, probable, and foreseeable effect of Eau Claire's unrestricted "open door" policy of accepting tuition transfer students was tantamount to an authorization for White students to flee the majority Black schools of Benton Harbor, was a means for perpetuating de jure segregation in the Benton Harbor public schools and was intended by Eau Claire to have that effect.

**299.** *See* Parts I(B) and III(B) *supra.*

**300.** Testimony of Reva Murphy, II Tr. 3933. Mrs. Murphy has been an Eau Claire Board member since 1968 and is in her third term as President of the Board. *Id.* at 3927–28.

**301.** *Id.* at 3932 33, 4010.

**302.** *Id.*

**303.** Stipulation between plaintiffs and State defendants at 4.

**304.** Taylor, II Tr. 1745.

**305.** *Id.* at 1394 95, 1446; PXR -307.

**306.** PXR -271 through -277.

**307.** *See* Part I(B)(2) *supra.*

Eau Claire Board member Mrs. Reva Murphy, a life-long resident of Eau Claire, testified that Eau Claire had accepted tuition students as long as she could remember and that such students are needed to maintain an adequate enrollment and sustain a balanced curriculum. She also testified that Eau Claire had been told by employees of the State Department of Education that bonding for Eau Claire's new high school building would not be approved unless the district increased enrollment by annexation or additional tuition students and that no student was ever denied admission as a tuition student upon the basis of race.[308]

Eau Claire's non-resident tuition student statistics break down as follows: [309]

| Year | Total Number | From BHASD | From Other K–12 Districts |
|------|------|------|------|
| 1970–71 | 31 | 17 | 14 |
| 1971–72 | 38 | 30 | 8 |
| 1972–73 | 43 | 37 | 6 |
| 1973–74 | 111 | 109 | 2 |
| 1974–75 | 143 | 142 | 1 |
| 1975–76 | 149 | 149 | 0 |
| 1976–77 | 110 | 107 | 3 |

By the time of the Sodus II petition, Eau Claire's "open door" was being taken advantage of almost solely by Benton Harbor students. These facts could not have escaped the notice of the Eau Claire administration and Board, who prepared the annual tuition student reports for submission to the SBE. The startling increase in tuition students from BHASD came at the same time the local papers continually emphasized the racial disorders in the Benton Harbor secondary schools.[310] Allowing the Eau Claire schools to be a refuge for White Benton Harbor students was an independent act of de jure segregation on the part of Eau Claire. The court notes that Eau Claire, by taking these tuition students, was engaging in cross-district bussing.

The Sodus I petition, filed March 26, 1971, involved an area containing 400 students and 5.2% of BHASD's total SEV.[311] Of the 400 students, 30% were Black.[312] The Eau Claire Board's minutes indicate the transfer proposal was discussed, but do not indicate what action was taken in response.[313] Testimony indicates that Eau Claire Superintendent Mc Alvey was instructed to appear at the SBE hearing and oppose the transfer. The basis for the opposition was threefold: (1) lack of facilities to handle that number of students; (2) a desire not to expand district boundaries that far; and (3) the belief that the district could not afford to purchase the large Stump-Nickerson school which lay within the transfer area.[314] Superintendent Mc Alvey appeared at the BCISD hearing on May 18, 1971 but stated only that the Board was "officially noncommitted at this time." [315]

Speaking at the SBE hearing, however, Superintendent Mc Alvey did not confine himself to simple opposition to the transfer, but stated what portions of the transfer area Eau Claire would accept: [316]

> "Let me point out, however, that we do not object to the transfer of some of the parcels of properties in this proposal. I speak of that part formerly known as the Sodus, Mt. Pleasant and Chadwick School District, or perhaps we could describe it as such property lying in Sodus Township south and east of Pipestone Creek, and I refer to that part formally. Many of the residents in this area are in close proximity to Eau Claire School facilities. Social and economic situations are compatible. Our bus routes would not have to be expanded too far from the present plan, and our facilities might be able to accommodate the enrollment within the area comfortably, for a few years."

308. II Tr. 3935, 3937–38, 3967.

309. PXR–292 through 298.

310. EC Ex. 24.

311. PXR- 258.

312. PXR- 257 at 3.

313. PXR 335 at 1.

314. Murphy, II Tr. 3940.

315. I 36 at 6.

316. SBE Ex. 3 c at 283.

Although this portion of Mc Alvey's statement had not been specifically authorized by the Board, it was representative of the position of the Board with regard to the transfer.[317]

Representatives of the Eau Claire Board were present at both Berrien Intermediate and the State Board hearings on the Sodus I transfer and had notice of Benton Harbor's concern about adverse racial impact as a result of the transfer and Benton Harbor's warning that the transfer of a predominantly White area from a predominantly Black school district to a predominantly White school district would be a segregative act. The Eau Claire Board was also aware of the racial composition of the area involved, and also in both the Benton Harbor district and the Eau Claire district.[318]

Before the Sodus petition was filed, Sodus residents came before the Eau Claire Board to seek support for another transfer attempt. The petitioners were told to "refine" their proposal from that which Eau Claire had earlier found to be unacceptable.[319] The Sodus II petition, filed March 5, 1973, was identical to the boundaries Superintendent Mc Alvey had stated would be acceptable to Eau Claire at the Sodus I hearing before the SBE. The major difference between the Sodus I and the Sodus II petitions was the elimination of what was the former Stump School District, an area with a higher percentage of Black students than the Sodus II area. Within the Stump area was a concentration of Black residents along Town Line Road, an area that had contributed to the 100% Black enrollment at the Stump-Alma School when it was closed in 1969.[320]

On April 18, 1973, the Eau Claire Board was addressed by Mrs. Zelma Fellner, one of the Sodus II petitioners and an intervening defendant here, and notified that the Benton Harbor Board on the previous day had voted not to oppose the transfer.[321] At this same meeting, the Eau Claire High School Student Senate presented a resolution, not further described, in opposition to acceptance of the transfer. Two days later the Board met again and unanimously passed the following resolution:[322]

"RESOLVED: that Eau Claire Public Schools not oppose the proposed Sodus area property transfer from the Benton Harbor area schools to the Eau Claire Public Schools, provided that if the former Sodus School building is involved in the transfer the cost for it shall not exceed $1.00; and further, that the indebtedness of the area involved for the Benton Harbor District's building obligations be determined in advance of the settlement, with the Eau Claire Board reserving the right to a final decision subject to resolving of that indebtedness and assumption of the Eau Claire District's bonded indebtedness by the transferees."

This resolution was presented to the BCISD by Sheldon Rosenberg, then President of the Eau Claire Board, on April 24, 1973.[323] The Intermediate Board took this resolution to mean that Eau Claire supported the transfer,[324] and on May 2, 1973, approved the transfer.[325]

After the BCISD approval and shortly before the SBE hearing on the appeal, the Eau Claire Board passed a resolution changing their position from one of nonopposition to the transfer to one of strong support for the transfer.[326]

"After reviewing the merits of the transfer of the former Sodus, Mount Pleasant and Chadwick School Districts to the present Eau Claire School District, *the*

317. Murphy, II Tr. 3942–45, 3951.

318. Eau Claire Stipulation.

319. Murphy, II Tr. 3946.

320. PXR–12.

321. PXR–335 at 1.

322. *Id.* at 2. II Tr. 3946 47.

323. I–45 at 10.

324. *Id.* at 3.

325. *Id.*

326. PXR–335 at 3.

*Eau Claire Board of Education wishes to go on record as strongly supporting the decision of the Berrien County Intermediate School Board granting the petition request. We of Eau Claire would warmly welcome the so-called Sodus area into our school district.*

Eau Claire has some 96 Sodus area students attending its schools on a tuition basis. These students have become an important and vital part of our school program. It would be a pleasure to be able to serve all the students in the transfer area.

We are perhaps most fortunate to be in a position to accommodate these students with a minimum amount of effort and expense. The area requesting transfer begins approximately 2½ miles from our new high school. Our buses already serve much of the area so there would be no transportation problem. With our new high school we now have ample classroom facilities in the district to accommodate all the transfer students without expansion or further capital outlay.

In summary we *would urge the Michigan State Board of Education to uphold the Berrien Intermediate Board's decision. We believe, since the Berrien Intermediate Board properly granted the transfer request on the basis of the facts and in view of the fact that it has been appealed by so few residents, and is unopposed by the Benton Harbor Board of Education and strongly supported by the Eau Claire Board of Education, the decision should stand.*" (Emphasis added.)

The approval of the Eau Claire Board was one of the grounds given by the SBE for the approval of the transfer.[327] Representatives of Eau Claire were present at the SBE hearing and therefore were aware of the testimony and statements given or read in opposition to the transfer by the appellants, by the NAACP, and by the State's Department of Civil Rights.[328] These statements warned that the transfer would have adverse educational and racial impacts upon the Benton Harbor district and would be an act of de jure segregation.[329]

The court finds that the Eau Claire Board was the prime mover behind the Sodus II transfer petition and that Eau Claire tailored the petition to specifications that would be acceptable to it. Eau Claire was aware of the adverse racial impact the transfer would have upon Benton Harbor and intended that result. As was discussed earlier, no sound educational reasons existed for the transfer.[330] The court must conclude that Eau Claire's support of the transfer was with the purpose and intent of providing a permanent refuge for White students seeking to escape the increasingly-Black Benton Harbor public schools.

Eau Claire argues, as did the Berrien Intermediate Board, that it cannot be held responsible for the attempted transfer because only the SBE has the power to finally approve a property transfer. It also argues, as did the State Board and the Intermediate Board, that, because the transfer was never effectuated, no liability can attach to it. The court rejects these arguments for the same reasons they were rejected when raised by the SBE and the BCISD.[331]

Eau Claire's "approval" of the transfer was relied upon by both the BCISD and the SBE in approving the transfer and was a proximate cause of that approval. The approval of the transfer, despite the fact that its effectuation was enjoined by this court and later reversed by the State Board, had devastating effects upon the BHASD and the children attending school in that district. The transfer once again destroyed any stability the district had and encouraged "White flight" from the district. Most importantly it conveyed the message to Black students within the Benton Harbor public schools that educational officials

---

327. SBE Ex. 7–a(b) at 2.

328. Eau Claire Stipulation.

329. *See* Part I(B)(2) *supra.*

330. *Id.*

331. *See* Parts I(B)(2) and III(B) *supra.*

were not opposed to separation of the races in area educational facilities and that Black students were not good enough to be attending school with White students.[332]

Finally, Eau Claire relies in large part upon the report compiled by its expert on "The Demography of the Benton Harbor School District."[333] The report concludes that the increase in Black students in the Benton Harbor Area School District can be attributed to a much higher birth rate among Black residents, a large in-migration of Black residents, and a large out-migration of White residents with no corresponding White in-migration.[334] The court, however, can place no reliance upon this report for it fails to take into account, to any extent, the impact of racial discrimination in housing, jobs, and educational opportunities upon the figures relied upon in the report. Nor does it take into account the actions of the various defendants which served to label the Benton Harbor district as a "Black" district and thereby encouraged White migration out of the district and discouraged White migration into the district.

■ The actions undertaken by Eau Claire had the natural, probable, and foreseeable result of increasing and maintaining segregation in the Benton Harbor public schools. The plaintiffs have shown that Eau Claire's actions did in fact substantially contribute to this result. Eau Claire has failed to show that its actions regarding tuition students and its support of the Sodus II transfer was a consistent and resolute application of racially neutral policies. The court must conclude that Eau Claire intended to provide its schools as a refuge for White students seeking to escape the majority Black Benton Harbor public schools.

*VI. Summary of Findings and Conclusions.*

The following is not all-inclusive, but simply a brief summary of the court's conclusions in Phases I and II of these proceedings. This summary is not intended to limit, replace, or modify the court's previously stated findings.

The Benton Harbor Area School District has been racially segregated almost from its inception. This segregation has pervaded all areas of the school district and all schools within the district. As a matter of fact and law, this condition of segregation resulted in unequal educational opportunities for Black and White students.

In Phase I of these proceedings, this court found that the BHASD followed a purposeful pattern of racial discrimination by intentionally creating and maintaining segregated schools in Benton Harbor. The Benton Harbor Board accomplished this by means of discriminatory teacher assignment policies, improper "tracking" of students at Benton Harbor Junior High School, failure to maintain equal educational facilities at identifiably White and identifiably Black schools, and segregative junior high feeder patterns. The Board also made discriminatory use of portable classrooms and temporary facilities. This court found that Benton Harbor, while purporting in theory to follow a racially neutral "neighborhood schools" policy, had in practice adhered to that policy where it justified racial segregation of students and deviated from the policy when necessary to prevent meaningful integration of its schools. The BHASD Board committed an independent act of de jure segregation by its reversal of policy and approval of the segregative Sodus II transfer proposal.

In these Phase II proceedings, this court has found that the State defendants, by their intentional actions and inactions contributed to the segregated conditions of the Benton Harbor public schools. Neither the Governor (an ex officio member of the State Board) nor the Attorney General has exercised his duties and responsibilities under the Michigan Constitution to see that the Constitutions of Michigan and of the

**332.** *Id.*

**333.** EC Ex. 20.

**334.** *Id.* at 31.

United States were faithfully executed with regard to the school children of Benton Harbor. Where a pattern of violation of constitutional rights is established, as has been here, the affirmative obligation under the Fourteenth Amendment to remedy those violations is imposed not only on the local district, but also upon state officials such as the Governor and Attorney General.

The affirmative obligation to remedy the segregation found to exist within the Benton Harbor public schools also rests upon the State Board of Education and the Superintendent of Public Instruction. Under the Michigan Constitution of 1963, the State Board and the Superintendent have general supervisory control over public education in Michigan. The local districts in the State of Michigan are instrumentalities of the State and subordinate to the SBE and the Superintendent. Therefore, the segregative actions and inactions of a local board of education are the actions of an agency of the State of Michigan and may be attributed to the SBE and the Superintendent of Public Instruction.

The State Board entered into a Joint Policy Statement with the Michigan Civil Rights Commission which pledged the SBE to make *"every effort" to prevent and eliminate segregation of school children upon the basis of race.* Despite this laudable pronouncement and despite the fact that the SBE, by virtue of lengthy studies of the Benton Harbor district and the SBE's participation in committees formed to study the problems of the BHASD, had a tremendous amount of information about public schools in Benton Harbor which could reasonably lead it to no other conclusion than that the Benton Harbor schools were the products of state-enforced segregation, the SBE and Superintendent took no action to prevent or eliminate continued segregation there. By their actions and inactions, the SBE and the Superintendent of Public Instruction intentionally sanctioned the segregation present in the Benton Harbor public schools.

The State Board also approved two property transfer petitions out of Benton Har-

bor which had the natural, probable, foreseeable, and actual result of increasing segregation within the BHASD. In light of the knowledge the SBE had of the effect these transfers would have upon the BHASD and in light of the lack of any sound educational purpose for the transfers, this court cannot conclude otherwise than that the actions were taken with the conscious intent of creating permanent refuges for White students seeking to escape a predominantly Black district. Approval of these transfer petitions created an atmosphere of chaos within the BHASD which effectively destroyed the district's ability to pass bonding proposals for desperately needed capital improvements for the district. Approval also led to a mad scramble to get out of the district to the extent that nearly one-quarter of the district's resident property owners and nearly one-half of its White students sought to flee. The activities of the SBE with regard to the transfer proposals served to label the BHASD as a "Black" district, unsuitable for White students, and thereby contributed to "White flight" from the district.

This court reads the statutory powers and responsibilities of the Berrien County Intermediate School District more broadly than does the Intermediate District. Where, as here, the Intermediate District is aware that state-enforced segregation is present in one of its constituent school districts, the Intermediate Board has the power, the responsibility, and the duty to furnish services on a consultant or supervisory basis to that local district in an attempt to eliminate de jure segregation there. This duty is a cardinal constitutional duty which the BCISD failed to execute. By its actions and inactions the Intermediate Board contributed to the segregation of the Benton Harbor public schools.

The Intermediate District, despite its constructive action in denying six successive petitions to transfer substantial amounts of property out of the BHASD, reversed its position and approved the Sodus II transfer in the absence of any sound educational purpose. This transfer would have had as

its natural, probable, and foreseeable result the increase and perpetuation of segregation in the Benton Harbor schools. The approval was not the result of a consistent and resolute application of racially neutral policies and can only be taken as an attempt to allow White residents of the Sodus II area to flee the predominantly Black BHASD. The grave effects of the approval, undertaken with segregative intent, were not undone by this court's order restraining the transfer and the SBE's eventual reversal of approval.

The Coloma and the Eau Claire school districts instigated and promoted property transfer attempts in two areas of the Benton Harbor district. Coloma's and Eau Claire's support for these two transfers were substantial causative factors in the approval of the petitions by the State Board. The natural, probable, and foreseeable effect of support of these transfers would be the perpetuation and increase of segregation of the Benton Harbor public schools. No sound educational reason existed as a basis for Coloma's and Eau Claire's support of the transfers and that support cannot be attributed to the consistent and resolute application of racially neutral policies. The court can only conclude that Coloma and Eau Claire intended the segregative effect of these transfers and intended to provide their districts as safe havens for White residents of the Benton Harbor district.

### VII. Conclusion.

At the time of its consolidation, the Benton Harbor Area School District was perhaps the largest and most ambitious school consolidation in southwestern Michigan. In addition to a state policy favoring K–12 districts, the consolidated Benton Harbor district had the highly commendable goal of equalizing school financing in the area and reducing the racial concentration then existing in the City of Benton Harbor public schools. But then, as in Joseph Heller's recent novel, "something happened" which led to the segregation of Black children within the district and destroyed hopes that

the BHASD would indeed function as a unified, consolidated district.

Defendants would have this court believe that that "something" was purely the result of demographic factors over which they had no control or influence. This court, however, has found that the segregation existing within the Benton Harbor district was the result of purposeful and intentional segregative acts committed by the various defendants. As such, the segregation offends the constitutional rights of the plaintiffs, and the class of persons they represent, just as surely as if the segregation was mandated by a state law.

The hopes of Black families and their children that consolidation would lead to equal educational opportunities were quickly dissipated. Teaching faculties and administrative staff remained segregated. The concentration of Black students within the inner-city schools constantly increased rather than decreased. Identifiably Black schools lacked libraries, adequate play areas, quality textbooks, and other basic educational materials available in identifiably White schools. As the number and percentage of Black students increased at certain schools to the point of overcrowding, the school district placed Black students into sub-standard portable or temporary facilities rather than transporting those students to nearby, identifiably White schools which had available space.

Black parents within the district brought their grievances before the BHASD Board, but received little satisfaction. They then plead for assistance from the State Board of Education. Again, state officials turned a deaf ear to their complaints. In frustration, this case was filed.

It must, therefore, surely have come as a shock to those plaintiffs that, while their claims awaited vindication before the District Court and the Court of Appeals, concerted attempts were begun to dismantle the BHASD upon the basis of race into separate and unequal school districts. Then, as if to increase the severity of the insult, the very state agency pledged to the elimination of segregation in Michigan's

public schools took actions which had as their natural, probable, foreseeable, and actual result the perpetuation and increase of segregation in the Benton Harbor public schools.

The Benton Harbor district at this time found itself under attack from all sides and from all levels of government. Private citizens in nearly one-quarter of the district, representing nearly one-half of all White students within the district, sought transfer to nearby, predominantly White districts. Some of those transfer petitions were instigated and aided by the adjoining districts, which sought to benefit from such transfers.

Proposals to separate the district along racial lines into two districts, one rich and White, the other poor and Black, were well publicized. Such proposals obtained an aura of respectability due to their serious consideration and eventual inclusion in the final report of the Redistricting Planning Committee. These unconstitutional (and eminently unfair) plans received support from prominent local officials, among them a local member of the State Boundary Commission,[335] members of the Benton Harbor school board,[336] and elected officials of Berrien County.[337] In light of this political atmosphere, approval by state officials of the Eaman and Sodus II transfer proposals was tantamount, in the eyes of Black residents of the BHASD, to state approval of separate education upon the basis of race.

The events which occurred in Benton Harbor amount to a rather sad story. As I have previously stated, it is not a pleasant task for this court to assess blame in cases such as this. But where constitutional rights have been violated to the extent detailed here, liability can and must be placed upon the guilty defendants. Those defendants found liable must now participate in a remedy designed to end segregation in the Benton Harbor Area School District.

In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851, 863 (1977), the Court stated:

"If such [constitutional] violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy."

As I noted in my Phase I opinion in this matter, *Berry v. School District of Benton Harbor*, 442 F.Supp. 1280, 1295 (1977), *Brinkman* reaffirms the principle that the scope of the remedy must be commensurate with the scope of the violation. *Milliken v. Bradley*, 418 U.S. 717, 746, 94 S.Ct. 3112, 3128, 41 L.Ed.2d 1069, 1090 (1974); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 567 (1971). In both Phase I and Phase II of these proceedings this court has meticulously detailed the violations committed by the various defendants and determined the effects of these violations upon the Benton Harbor Area School District. These findings have been made in

**335.** Oscar Weidler was appointed as the local member of the State Boundary Commission by the Chief Probate Judge of Berrien County. He signed, as representative of the Fairplain-East area, a public petition advocating the adoption of the "Gargano plan" which would split the BHASD along racial and economic lines. II Tr. 2331–55. This proposal stated: "If it is true that there are known limits to sustain an integrated school system of good quality, then change is called for." II Tr. 2339. On April 25, 1973, some two weeks after the Gargano petition, Mr. Weidler was one of five signatories to

an open letter to the BHASD Board which appeared in the local newspaper. This letter called for the redistricting of the BHASD. II Tr. 2355–65.

**336.** *See* note 98 *supra.*

**337.** Nancy Clark is presently Chairman of the Berrien County Board of Commissioners, serving on the Board previous to her election as Chairman. II Tr. 2368. Mrs. Clark was a petitioner in the Fairplain transfer petition. II Tr. 1586.

cognizance of *Brinkman's* directive that I must find the incremental effects of these segregative acts.

As to Benton Harbor, the incremental effect of the Benton Harbor Area School District's segregative acts has been the system-wide de jure segregation of that school district. The BHASD has been found to have engaged in segregative acts throughout the length and breadth of their school system. Although specific proof as to the percentage-wise impact of these segregative acts has not been submitted as to each Benton Harbor school, it must be remembered that *Brinkman* does not overrule the holding in *Keyes* that where segregative acts can be found in one portion of the school system they can be presumed to have occurred in the remainder of the system's schools. Likewise, where a segregative impact has been shown to have occurred in a substantial portion of a district's schools it may be presumed that a substantial segregative impact has occurred in the remainder of the district. The BHASD has offered no evidence to rebut that presumption.

As to the actions of Coloma and Eau Claire, the Intermediate District, and the State Board of Education, the court has also detailed the drastic effect those actions had upon the Benton Harbor district. Those actions created a period of chaos in Benton Harbor that effectively destroyed the BHASD's ability to contend with the many problems the district faced, a blow from which Benton Harbor has never recovered. Those actions, because they served to label the Benton Harbor district as a Black district, spurred the massive White flight which has afflicted Benton Harbor. Those effects were felt throughout the Benton Harbor district and were reflected back into the adjoining districts. This exacerbated the segregation which was present in the BHASD. Such acts could only be interpreted by the district's Black community as an official expression of rejection by the White community; a statement that Coloma and Eau Claire were willing to offer their official school district boundaries as a haven for those Whites who were unwilling to accept an integrated school system. Such acts by

the State and its subdivisions can only be found to have had a substantial, not a de minimis, effect upon all the school districts involved. *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974).

This court recognizes that the primary responsibility for providing a remedy lies with defendants, who are intimately involved in the operation of the educational system. *Brown II*, 349 U.S. 294, at 299, 75 S.Ct. 753, at 756, 99 L.Ed. 1083, at 1105. Since any remedy, however, must be designed to vindicate the rights of the community as a whole, it is recommended that defendants consult with responsible community leaders, both Black and White, to determine what remedies might best alleviate the violations I have found today. Such plans should be presented to this court no later than 40 days after the entry of an order in this case. At that time, I will take the plans under advisement and may refer them to a panel of experts for their evaluation. All plans must be designed to remedy the constitutional violations which this court has found and the impact which they have had on the school districts involved. *Brinkman, supra*; *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). It should be remembered that all plans must have the ability to work and to work now. *Green v. County School Board of New Kent County,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, 724 (1968).

This court recognizes that its order involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Accordingly, this court is certifying today's decision for immediate interlocutory appeal. This does not mean, however, that the parties should minimize their efforts in drafting acceptable desegregation plans.

### ORDER

In Phase I of these proceedings, this court found that defendant Benton Harbor

Area School District (BHASD) had purposefully created and maintained segregated schools in Benton Harbor. Because any plan to remedy this segregation would be affected by the potential liability of the other defendants, BHASD was not required to submit a plan for desegregation until Phase II of the litigation had concluded. This court has just completed Phase II and it accordingly finds that plaintiffs have proven by a preponderance of the evidence that the following defendants, through their intentional actions and inactions, contributed to the segregated conditions of the Benton Harbor public schools: William G. Milliken, Governor of the State of Michigan, who has specified constitutional, statutory and public policy duties which he omissioned. Also, Frank J. Kelly, Attorney General of the State of Michigan; John W. Porter, Superintendent of Public Instruction of the State of Michigan; the State Board of Education; the Berrien County Intermediate School District and its Superintendent; the Eau Claire School District and its Superintendent, Donald McAlvey; and the Coloma Community School District and its Superintendent, William Barrett. Having determined which defendants are liable, it is this court's order that these defendants participate in formulating a remedy which will eradicate the constitutional violations which have been found and the effects which these violations have had on the Benton Harbor Area School District.

Therefore, IT IS HEREBY ORDERED:

(1) That a Desegregation Planning Committee be established to formulate a plan which will eradicate all vestiges of segregation in the Benton Harbor Area School District. The membership of this committee will be composed of: the State Superintendent of Public Instruction, who will chair the committee; the superintendents of the Berrien County Intermediate School District, and of Benton Harbor, Coloma, and Eau Claire School Districts; a representative appointed by the Governor; and a representative appointed by the Attorney General of the State of Michigan. As this court has found that the defendants' segregative actions had a system-wide effect upon the BHASD, it will be necessary for the committee to draft a plan which will encompass a system-wide remedy. Since any remedy must be designed to vindicate the rights of the community as a whole, it is recommended that defendants consult with responsible community leaders, both Black and White, to determine what remedies might be appropriate.

As a starting point, the committee should strive to establish an enrollment in each school that reflects, as nearly as possible, the racial make-up of the district's entire school population. The committee should also try to distribute teachers, staff, and administrative personnel in the same fashion. Defendants should be aware that this court will view with displeasure any plan which creates or perpetuates schools which are racially identifiable.

(2) This court has found that the intentional and segregative actions of the Coloma and Eau Claire School Districts had a substantial cross-district effect upon the racial composition of the BHASD. The court orders the committee to correct this racial impact. The remedy must also be designed to eradicate the effects which the Eaman and Sodus II transfers had on the BHASD. Among the effects which this court has found was the chaos that occurred within the BHASD which effectively destroyed the district's ability to pass bonding proposals for needed capital improvements; increased "White flight;" and the psychological impact which these transfers had on the district's Black and White children.

(3) The Berrien County Intermediate District Board has failed to stringently adhere to the mandates of the United States Constitution and of the Michigan Constitution which require that education be provided without discrimination on the basis of race. U.S.Const., amend. XIII, XIV; Mich.Const., art. VIII, § 2. It has also not put into practice the educational policies of the State Board of Education as is required by M.C.L.A. § 340.298a, because it did not act affirmatively to implement the State Board's Joint Policy Statement which re-

quired that every effort be used to prevent and eliminate segregation. These constitutional and statutory provisions require that an intermediate board protect those who might be victimized by intentional and willful school segregation. The Berrien County Intermediate District Board has failed to do this.

This court permanently enjoins the Berrien County Intermediate District Board and its Superintendent from taking any further actions which might create, perpetuate, facilitate or maintain racial segregation in any of the school districts within Berrien County, especially those involving Benton Harbor, Eau Claire, and Coloma School Districts. These defendants are likewise ordered to effect such procedural changes as will, in the future, prevent the possibility of racially segregative property transfers from being approved.

(4) The State Board of Education and its Superintendent have been entrusted with the leadership and general supervision of all public schools in Michigan. Mich.Const., art. VIII, § 3. This court has found, however, that they have failed as both leaders and supervisors for they failed to implement the Joint Policy Statement even though they were aware of the segregation which existed in Benton Harbor. Therefore, this court permanently enjoins the State Board of Education and its Superintendent from any further acts which would maintain, create, or facilitate the existence of racial segregation and discrimination in the public schools of Berrien County, including the granting of property transfers which have racially segregative impacts.

(5) The Eau Claire Board of Education and its Superintendent along with the Coloma Board of Education and its Superintendent are hereby permanently enjoined from taking any further actions which might create, maintain, or facilitate the racial segregation within the Benton Harbor Area School District.

The court cautions all non-public schools to take whatever steps may be necessary to prevent having their facilities become havens for those who might seek to escape or flee the desegregation of the Benton Harbor, Eau Claire and Coloma School Districts being contemplated by this court.

(6) The Superintendent of the Intermediate School District shall also be responsible for seeing to it that all tuition transfers from Benton Harbor to any other school district in Berrien County over the past five years are specifically identified on a list to be provided this court, indicating the home district, receiving district, student name, student address, student age and grade, school the student would have attended in Benton Harbor, school the student is presently attending in the receiving district, and the money presently being paid in tuition transfer, including the source of the payment.

(7) The committee is cautioned that any plan which is proposed must do more than simply readjust enrollment patterns. The Desegregation Planning Committee is ordered to test those pupils who bore the brunt of defendants' segregative acts. If it is determined that defendants' actions and inactions caused these students to be less advanced academically than their peers, then the Committee is ordered to adopt any remedial program which is necessary to alleviate this problem.

The Committee shall also include within its proposed desegregation plans such educational programs as might be necessary to fully offset the continuing vestiges of racial discrimination and segregation, including: staff and faculty in-service training; review of disciplinary and testing materials and procedures to guarantee that racial bias has been guarded against; review of textbooks and other teaching aids to assure that such materials provide a true multi-culture depiction of American society, including the contributions of the various racial/ethnic groups to the growth and development of this country; vocational programming and other career-related programming and facilities; and guidance and counseling programs.

(8) Defendants will submit their proposed desegregation plans no later than 40 days after the release of this order. To facilitate

the committee with its work, the Superintendent of the Berrien County Intermediate District shall provide such space as the committee requires. The Benton Harbor, Coloma, and Eau Claire School Districts shall provide any staff assistance which the committee requires.

(9) The court advises that defendants will be permitted to use any reasonable tool, devise or plan that will reasonably accomplish the desired integration including, but not exclusively: the pairing and clustering of schools; student transportation; changes in school attendance zones and/or changes in school grade structures; and allowing majority to minority transfers.

(10) The State Board of Education, through its Superintendent and Department, is hereby ordered to identify and report to the court on such state and federal financial assistance as is now available to assist in the development and implementation of the desegregation process which this court has ordered. All defendants, either jointly or individually, are hereby ordered to promptly submit financial assistance applications to the federal, state or private sources from which any form of financial assistance may be secured.

(11) The Clerk will award all plaintiffs and the class they represent those costs which are allowable to prevailing plaintiffs under the applicable law. These costs will be born equally by all defendants who have been found liable in Phase I and Phase II of these proceedings.

(12) Pursuant to 28 U.S.C. § 1292(b), this court certifies that with respect to the above findings of liability this judgment order involves controlling questions of law as to which there are substantial grounds for difference of opinion and further certifies that an immediate appeal from this judgment may materially advance the ultimate termination of this litigation.

### AMENDED ORDER

In Phase I of these proceedings, this court found that defendant Benton Harbor Area School District (BHASD) had purposefully created and maintained segregated schools in Benton Harbor. Because any plan to remedy this segregation would be affected by the potential liability of the other defendants, BHASD was not required to submit a plan for desegregation until Phase II of the litigation had concluded. This court has just completed Phase II and it accordingly finds that plaintiffs have proven by a preponderance of the evidence that the following defendants, through their intentional actions and inactions, contributed to the segregated conditions of the Benton Harbor public schools: William G. Milliken, Governor of the State of Michigan, who has specified constitutional, statutory and public policy duties which he omissioned; also, Frank J. Kelly, Attorney General of the State of Michigan; John W. Porter, Superintendent of Public Instruction of the State of Michigan; the State Board of Education; the Berrien County Intermediate School District and its Superintendent; the Eau Claire School District and its Superintendent, Donald McAlvey; and the Coloma Community School District and its Superintendent, William Barrett. Having determined which defendants are liable, it is this court's order that these defendants participate in formulating a remedy which will eradicate the constitutional violations which have been found and the effects which these violations have had on the Benton Harbor Area School District.

Therefore, IT IS HEREBY ORDERED:

(1) That a Desegregation Planning Committee be established to formulate a plan which will eradicate all vestiges of de jure segregation in the Benton Harbor Area School District. The membership of this committee will be composed of: the State Superintendent of Public Instruction, who will chair the committee; the superintendents of the Berrien County Intermediate School District, and of Benton Harbor, Coloma, and Eau Claire School Districts; a representative appointed by the Governor; and a representative appointed by the Attorney General of the State of Michigan. As this court has found that the defendants' segregative actions had a system-wide effect upon the BHASD, it will be necessary

for the committee to draft a plan which will encompass a system-wide remedy. Since any remedy must be designed to vindicate the rights of the community as a whole, it is recommended that defendants consult with responsible community leaders, both Black and White, to determine what remedies might be appropriate.

As a starting point, the committee should strive to establish an enrollment in each school that reflects, as nearly as possible, the racial make-up of the district's entire school population. The committee should also try to distribute teachers, staff, and administrative personnel in the same fashion. Defendants should be aware that this court will view with displeasure any plan which creates or perpetuates schools which are racially identifiable.

(2) This court has found that the intentional and segregative actions of the Coloma and Eau Claire School Districts had a substantial cross-district effect upon the racial composition of the BHASD. The court orders the committee to correct this racial impact. The remedy must also be designed to eradicate the effects which the Eaman and Sodus II transfers had on the BHASD. Among the effects which this court has found was the chaos that occurred within the BHASD which effectively destroyed the district's ability to pass bonding proposals for needed capital improvements; increased "White flight;" and the psychological impact which these transfers had on the district's Black and White children.

(3) The Berrien County Intermediate District Board has failed to stringently adhere to the mandates of the United States Constitution and of the Michigan Constitution which require that education be provided without discrimination on the basis of race. U.S.Const., amend. XIII, XIV; Mich.Const., art. VIII, § 2. It has also not put into practice the educational policies of the State Board of Education as is required by M.C.L.A. § 340.298a, because it did not act affirmatively to implement the State Board's Joint Policy Statement which required that every effort be used to prevent and eliminate segregation. These constitutional and statutory provisions require that an intermediate board protect those who might be victimized by intentional and willful school segregation. The Berrien County Intermediate District Board has failed to do this.

This court permanently enjoins the Berrien County Intermediate District Board and its Superintendent from taking any further actions which might create, perpetuate, facilitate or maintain racial segregation in any of the school districts within Berrien County, especially those involving Benton Harbor, Eau Claire, and Coloma School Districts. These defendants are likewise ordered to effect such procedural changes as will, in the future, prevent the possibility of racially segregative property transfers from being approved.

(4) The State Board of Education and its Superintendent have been entrusted with the leadership and general supervision of all public schools in Michigan. Mich.Const., art. VIII, § 3. This court has found, however, that they have failed as both leaders and supervisors for they failed to implement the Joint Policy Statement even though they were aware of the segregation which existed in Benton Harbor. Therefore, this court permanently enjoins the State Board of Education and its Superintendent from any further acts which would maintain, create, or facilitate the existence of racial segregation and discrimination in the public schools of Berrien County, including the granting of property transfers which have racially segregative impacts.

(5) The Eau Claire Board of Education and its Superintendent along with the Coloma Board of Education and its Superintendent are hereby permanently enjoined from taking any further actions which might create, maintain, or facilitate the racial segregation within the Benton Harbor Area School District.

The court cautions all non-public schools to take whatever steps may be necessary to prevent having their facilities become havens for those who might seek to escape or flee the desegregation of the Benton Harbor, Eau Claire and Coloma School Districts being contemplated by this court.

(6) The Superintendent of the Intermediate School District shall also provide this court with a list which specifically identifies all tuition transfers from Benton Harbor to any other school district in Berrien County since the creation of the Benton Harbor Area School District in 1965–66. This list shall also indicate each student's name, address, age, and grade; his home district and the receiving district; the school the student would have attended in Benton Harbor and the school the student actually attended in the receiving district; the money which was paid in tuition transfer and the source of the payment.

(7) The committee is cautioned that any plan which is proposed must do more than simply readjust enrollment patterns. The Desegregation Planning Committee is ordered to test those pupils who bore the brunt of defendants' segregative acts. If it is determined that defendants' actions and inactions caused these students to be less advanced academically than their peers, then the Committee is ordered to adopt any remedial program which is necessary to alleviate this problem.

The Committee shall also include within its proposed desegregation plans such educational programs as might be necessary to fully offset the continuing vestiges of racial discrimination and segregation, including: staff and faculty in-service training; review of disciplinary and testing materials and procedures to guarantee that racial bias has been guarded against; review of textbooks and other teaching aids to assure that such materials provide a true multi-culture depiction of American society, including the contributions of the various racial/ethnic groups to the growth and development of this country; vocational programming and other career-related programming and facilities; and guidance and counseling programs.

(8) Defendants will submit their proposed desegregation plans no later than 40 days after the release of this order. To facilitate the committee with its work, the Superintendent of the Berrien County Intermediate District shall provide such space as the committee requires. The Benton Harbor, Coloma, and Eau Claire School Districts shall provide any staff assistance which the committee requires.

(9) The court advises that defendants will be permitted to use any reasonable tool, devise or plan that will reasonably accomplish the desired integration including, but not exclusively: the pairing and clustering of schools; student transportation; changes in school attendance zones and/or changes in school grade structures; and allowing majority to minority transfers.

(10) The State Board of Education, through its Superintendent and Department, is hereby ordered to identify and report to the court on such state and federal financial assistance as is now available to assist in the development and implementation of the desegregation process which this court has ordered. All defendants, either jointly or individually, are hereby ordered to promptly submit financial assistance applications to the federal, state or private sources from which any form of financial assistance may be secured.

(11) The State Board of Education is required to affirmatively put into practice the educational policies of the State and of the Board, and foremost among these policies is the assurance that education be provided without discrimination. Mich.Const., art. VIII, § 2. The Berrien County Intermediate School District has similar duties as this court has found it to have an affirmative duty to offer its supervisory or consultant services to local districts in order to remedy de jure segregation and its effects.

In light of these affirmative duties to eradicate de jure segregation, this court orders the State Board of Education and the Berrien County Intermediate School District to undertake a detailed examination of all school districts in Berrien County, especially St. Joseph, Watervliet, River, and Riverside, to determine if de jure segregation has at any time existed in these districts, and if so, to determine if all vestiges of this discrimination have been eradicated. All findings will be released to the court as soon as they are ready.

(12) The Clerk will award all plaintiffs and the class they represent those costs which are allowable to prevailing plaintiffs under the applicable law. These costs will be born equally by all defendants who have been found liable in Phase I and Phase II of these proceedings.

(13) Pursuant to 28 U.S.C. § 1292(b), this court certifies that with respect to the above findings of liability this judgment order involves controlling questions of law as to which there are substantial grounds for difference of opinion and further certifies that an immediate appeal from this judgment may materially advance the ultimate termination of this litigation.

See also, D.C., 467 F.Supp. 721.